UNION PACIFIC RAILROAD COMPANY et al., Plaintiffs,

v.

UNITED STATES OF AMERICA and Interstate Commerce Commission, Defendants.

Civ. A. No. 76–53.

United States District Court
D. Nebraska, Omaha Division.
Oct. 22, 1954.

Elmer B. Collins, Asst. Western Gen. Counsel, Omaha, Neb., John J. Burchell and W. R. Rouse, Omaha, Neb., of counsel, for Union Pac. R. Co.

F. O. Steadry, Chicago, Ill., for Chicago & N. W. Ry. Co. and Chicago, St. Paul, Minneapolis & Omaha Ry. Co.

Carson L. Taylor, Chicago, Ill., for Chicago, Milwaukee, St. Paul and Pacific R. Co.

Eugene S. Davis, St. Louis, Mo., for Wabash R. Co.

Robert E. Quirk, Washington, D. C., Harry L. Welch, Omaha, Neb., and Herbert M. Boyle, Denver, Colo., for Denver & Rio Grande Western R. Co.

L. E. Torinus, Jr., St. Paul, Minn., for Great Northern Ry. Co.

Bert L. Overcash, Lincoln, Neb. (Clarence S. Beck, Atty. Gen., of Nebraska, was on the brief), for the State of Nebraska and Nebraska State Railway Commission.

Robert L. Simpson, Olympia, Wash. (Don Eastvold, Atty. Gen., of Washington, was on the brief), for Washington Pub. Service Comm.

John H. Carkin, Salem, Or. (C. W. Ferguson was with him on the brief), for Public Utilities Comm. of Oregon.

John H. Risken, Helena, Mont., for Board of Railroad Commissioners of the State of Montana.

Howard B. Black, Atty. Gen., of Wyoming, for State Board of Equalization and Public Service Commission of Wyoming.

Justus R. Moll, Washington, D. C., and J. D. Cranny and J. P. Moore, Omaha, Neb., for M. P. Caveny, of Omaha, chairman of the Union Pac. General Chairmen's Assn.

Ray McGrath, Omaha, Neb., for Idaho Farm Bureau, Public Service Comm. of Utah, Committees of the Railroad Brotherhoods who work for the D & RG, and National Livestock Producers Assn.

Warren H. Ploeger, St. Paul, Minn., and Roland J. Lehman, Chicago, Ill., on the brief, Nye F. Morehouse, Chicago, Ill., M. L. Countryman, Jr., Edwin C. Matthias, St. Paul, Minn., J. C. Gibson, M. L. Bluhm, Chicago, Ill., Joseph H. Miller, St. Louis, Mo., of counsel, for plaintiffs.

Edward M. Reidy Chief Counsel, Washington, D. C., and Samuel R. Howell, Asst. Chief Counsel, Washington, D. C., of counsel, for Interstate Commerce Comm.

Henry A. Cockrum, Acting Assoc. Solicitor, U. S. Dept. of Agriculture, Washington, D. C., Charles W. Bucy, Associate Solicitor, Washington, D. C., was with him on the brief for the Dept. of Agriculture.

E. Riggs McConnell, Special Asst. to the Atty. Gen., Stanley N. Barnes, Asst. Atty. Gen., James E. Kilday, Special Asst. to the Atty. Gen., and Donald R. Ross, U. S. Atty., Omaha, Neb., were with him on the brief for the United States.

Before JOHNSEN and COLLET, Circuit Judges, and DELEHANT, District Judge.

COLLET, Circuit Judge.

The Denver and Rio Grande Western Railroad Company, hereafter referred to as the Rio Grande, filed a complaint with the Interstate Commerce Commission requesting the Commission to order the Union Pacific Railroad Company (and other lines comprising the Union Pacific System, together with connecting carriers comprising, in all, 221 railroads, which will be referred to as the Union Pacific) to file joint rates over through routes with the Rio Grande for the transportation of freight from and to certain areas. The Commission granted the request as to certain types of freight with substantial territorial limitations. The Union Pacific brings this action to enjoin and set aside the order. A reference to a map of the United States will be helpful in understanding the following summarization of the facts.

The northern terminus of the Rio Grande is Ogden, Utah. From Ogden it runs south through Salt Lake City and Provo, Utah, then southeasterly and east, entering Colorado at about the south central part of that state, thence east and somewhat north through the central part of Colorado to Dotsero, west of Denver, where it divides, one branch going on east to Denver, the other swinging south and east to Pueblo, Colorado. From Denver the Rio Grande line runs south through Colorado Springs to Pueblo and Trinidad. Other lines serve territory in southern Utah, northwestern New Mexico, and southern Colorado. These latter lines are not of special importance in this action. At Denver, Colorado Springs, Pueblo, and Trinidad the Rio Grande maintains joint rates and through routes with lines other than the Union Pacific to destinations east and south of those points.

The Union Pacific (including connecting lines which were defendants in the I.C.C. proceedings) serves the greater part of the east, south and midwestern sections of the United States. Traffic involved in this action from those sections flowing westward over the Union Pacific and connecting lines converges at Denver and Cheyenne, Wyoming, then moves westwardly across the southern part of Wyoming to Ogden and Salt Lake City. One of its lines runs from Salt Lake City south to Provo, Utah, thence southwest to Los Angeles, California.

The Union Pacific also serves the northwestern part of the United States, including that part of Utah north of Ogden, Idaho, Montana, Oregon, and Washington. It is traffic from and to this latter territory, referred to herein as the northwest territory or area, which is the principal subject of the present controversy.

The Union Pacific maintains joint rates and through routes over its lines and with many connecting carriers from and to the northwest territory through Ogden and Salt Lake City, Cheyenne, Denver, and points east and south to the Atlantic Seaboard and the Gulf of Mexico. For a comparatively short distance, from Ogden through Salt Lake City to Provo, where the Los Angeles line swings southwest, the Union Pacific and the Rio Grande parallel and serve some common points. To and from these points, joint rates and through routes are maintained by the Union Pacific over its lines with the northwest territory and the area east of Cheyenne and Denver served by the Union Pacific. The Union Pacific does not maintain joint through rates with the Rio Grande, with certain exceptions not material in this proceeding. Freight moving from the northwest territory to points in southern Utah and Colorado on the Rio Grande, finally destined to points east of the eastern termini of the Rio Grande, moves on the combination rate, consisting of the total of the Union Pacific rate to Ogden via Union Pacific and the Rio Grande rate from Ogden via Rio Grande to points on the Rio Grande. The same is true of the rates on shipments from points east of Denver to those points on the Rio Grande finally destined to the northwest territory. This combination of rates, or combination rate, as it is called, is considerably higher than a joint through rate. Freight moving from and to the northwest territory from and to all points east of Denver[1] served by the Union Pacific and connecting carriers has the benefit of joint through rates via Union Pacific, with accompanying in-transit privileges en route, while freight originating on the Union Pacific in the northwest territory and moving to the area east of Denver, which is routed over the Rio Grande, pays the combination rate without in-transit privileges at points on the Rio Grande. The result is that practically all of the long-haul traffic originating in the northwest area and destined to the area east of Denver goes over the Union Pacific all the way on the lower joint and through rates. Since the formal record before the Commission consists of 1,957 pages of testimony, 57 exhibits and 74 verified statements, the foregoing statement is obviously only a salient outline of the basis for the Rio Grande's complaint. For a complete understanding of the intricacies of the case by one un-

---

1. "All points east of Denver" will be used as the designation of all points included in the Commission's order to or from which through routes and joint rates were ordered established by the Union Pacific with the Rio Grande. The Commission's order in this respect was: (287 I.C.C. 611, 659)
  "We conclude:
  "1. That it is necessary and desirable in the public interest, in order to provide adequate and more economic transporation, that through routes, and joint rates over such routes the same as apply over the Union Pacific and its connecting lines, defendants herein, be established via Ogden or Salt Lake City, in connection with the Rio Grande, on granite and marble monuments, in carloads, from origins in Vermont and Georgia to destinations in the excluded territory in the northwest area, as previously described herein, and on ordinary livestock, fresh fruits and vegetables, dried beans, frozen poultry, frozen foods, butter, and eggs, in carloads, from origins in the excluded territory to destinations in the United States south and east of a line drawn along the southern boundary of Kansas, thence the eastern boundary of Kansas to but not including Kansas City, thence immediately west of points on the Missouri River from Kansas City, Kans., to Omaha, thence immediately north of points on the route of the Union Pacific and the Chicago & North Western from Omaha to Chicago, including destinations in the Lower Peninsula of Michigan and in Oklahoma and Texas."

familiar with the record, it will be necessary to refer to the extensive report and order of the Commission reported in 287 I.C.C. 611.

The Commission ordered the establishment of through routes and joint rates via Ogden or Salt Lake City by the Union Pacific with the Rio Grande for the transportation of granite and marble monuments in carloads from points of origin in Vermont and Georgia to destinations in the northwest area, and on ordinary livestock, fresh fruits and vegetables, dried beans, frozen poultry, frozen foods, butter and eggs, in carloads, from points of origin in the northwest territory to destinations "east of Denver." The order is based upon three primary basic findings. First, that the through routes and joint rates are necessary and desirable in the public interest, in order to provide *adequate and more economic transportation;* second, that the existing joint rates maintained by the Union Pacific are and will be *unjust and unreasonable and unduly prejudicial* to shippers and receivers of freight using or desiring to use the Rio Grande and *unduly preferential to shippers and receivers of freight using the Union Pacific;* third, that the maintenance by the Union Pacific of joint rates with the Bamberger Railroad between the northwest area and points on the Bamberger line between Ogden and Salt Lake City, while refusing to establish joint rates with the Rio Grande to and from the same points on the Rio Grande between Ogden and Salt Lake City, subjects the Rio Grande to discrimination in violation of Sec. 3(4) of the Interstate Commerce Act, 49 U.S.C.A. § 3(4). Finding No. 1 has heretofore been quoted in footnote 1. Findings 2 and 3 are set out below.[2] To understand the import of these findings it is necessary to explain the factual theory upon which they are based.

First as to the finding that the rates ordered are necessary and desirable to provide adequate and more economic transportation. Located along the route of the Rio Grande, between Ogden on the west and Denver, Pueblo and Trinidad on the eastern termini, are a number of livestock feeders. Some of these are ranchers who graze and feed cattle and sheep. Others are operators of beet sugar plants which produce livestock feed as a by-product and feed the by-product to livestock. These livestock feeders buy cattle and sheep in the northwest area, which are ultimately destined for the market, and ship them to points on the Rio Grande for feeding. Many of the principal livestock markets of the United States are located east of Denver. Without joint through rates with intransit privileges which would permit these livestock feeders to ship from the northwest area to the feeding points on the Rio Grande and then reship on joint through rates to points east of Denver, Pueblo, and Trinidad, they are at a substantial rate disadvantage with similar livestock feeders following the same practice who are located on the Union Pacific lines between Ogden and Provo, and between Ogden and Salt Lake City and Denver, located on the Union Pacific, who reship to points east of Denver. They are also at a substantial

2. "2. That the assailed rates on the commodities and from and to the points described in the foregoing finding are and for the future will be unjust and unreasonable, and unduly prejudicial of shippers and receivers using, or desiring to use, the Rio Grande routes and unduly preferential of shippers and receivers using the Union Pacific routes, in and to the extent that they exceed or may exceed the joint rates maintained on such commodities from and to the same points over the Union Pacific routes.

"3. That the maintenance by the Union Pacific and other defendants of joint rates between points in the northwest area, on the one hand, and points on the Bamberger Railroad south of Ogden, on the other hand, while refusing to participate in like rates to and from the same points on the Rio Grande south of Ogden, subjects the Rio Grande to discrimination in violation of section 3(4) of the act." 287 I.C.C. 611, 659–660.

rate disadvantage in purchasing livestock in the northwest area in competition with buyers located on the Union Pacific lines west of Denver and Cheyenne who have the benefit of joint through rates and in-transit privileges over the Union Pacific.

Also located on the Rio Grande are a number of industries which clean, package, process, freeze, and store fresh fruits, vegetables, poultry, food products, butter, eggs and beans, and ship them on east to points beyond Denver, Pueblo and Trinidad. These industries are at a comparable rate disadvantage, without in-transit privileges, as livestock feeders, and for the same reasons.

Monument dealers obtaining or shipping granite and marble from Vermont and Georgia are unable to ship full carloads to the northwest territory and have the rate advantage of partially unloading cars at intermediate points on the Rio Grande under in-transit privileges of through routes and joint rates which are available at points located on the Union Pacific.

This finding, which is finding No. 1 quoted in the footnote, is held by the Commission to justify ordering the establishment of through routes and joint rates under Secs. 15(3) and 15(4). Title 49 U.S.C.A. §§ 15(3) and 15(4). Sec. 15(3) empowers the Commission to establish through routes and joint rates when necessary or desirable in the public interest,[3] but Sec. 15(4) prohibits the Commission from ordering the establishment of through routes by a carrier under Sec. 15(3) without the carrier's consent if the result would be to short-haul that carrier unless, as provided by Sec. 15(4), the Commission finds that the through route is needed in order to provide (1) *adequate,* and (2) *more efficient or more economic* transportation.[4]

The Commission accurately states the legal effect of Sec. 15(4) in its report (Denver & R. G. W. R. Co. v. Union Pac. R. Co., 287 I.C.C. 611) at page 655 as follows:

"Since the two decisions last above referred to, section 15(4) has been amended (in 1940), so that now the prohibition against short hauling is subject, not only to the exception that such inclusion of lines must not make the through route unreasonably long as compared with another practicable through route which could otherwise be established, but to the additional exception that the short-hauling provision may be disregarded where the 'through route proposed to be established is needed in order to provide adequate, and more efficient or more economic, transportation.' Thus, where as here we are asked to disregard the short-hauling provision, we must give consideration, first, to the adequacy of the transportation, and second, to the efficiency and economy of the transportation. In Pennsylvania R. Co. v. United States, 323

---

3. "Sec. 15(3) The Commission may, and it shall whenever deemed by it to be necessary or desirable in the public interest, * * * establish through routes, * * and joint rates, * * * applicable to the transportation of * * * property by carriers subject to this part, * *."

4. "Sec. 15 (4) In establishing any such through route the Commission shall not * * * require any carrier by railroad, without its consent, to embrace in such route substantially less than the entire length of its railroad and of any intermediate railroad operated in conjunction and under a common management or control therewith, which lies between the termini of such proposed through route,

* * * (b) unless the Commission finds that the through route proposed to be established is needed in order to provide adequate, and more efficient or more economic, transportation: *Provided, however,* That in prescribing through routes the Commission shall, so far as is consistent with the public interest, and subject to the foregoing limitations in clauses (a) and (b), give reasonable preference to the carrier by railroad which originates the traffic. No through route and joint rates applicable thereto shall be established by the Commission for the purpose of assisting any carrier that would participate therein to meet its financial needs. * * * "

U.S. 588 [65 S.Ct. 543, 89 L.Ed. 478], which affirmed the judgment of a lower court sustaining an order of division 2 in D. A. Stickell & Sons, Inc., v. Alton R. Co., supra, the Supreme Court said that the expressions 'more efficient or more economic' transportation, as used in section 15(4), 'may well embrace both shippers' and carriers' interests, * * * that both interests should be considered and a fair balance found.' These latter considerations are not determinative, however, unless the existing routes can be found not to provide 'adequate' transportation.

"In the proceeding just mentioned, the Supreme Court said that adequacy of transportation relates only to the interest of the shipping public, whereas, as above stated, efficient and economic transportation embraces both shipper and carrier interests."

■ Was there evidence to support the finding of inadequacy? Only in the event there was inadequacy of transportation can the question of efficiency or economy be reached. It is clear from the report and the evidence that the finding of inadequacy is based upon the lack of in-transit privileges by shippers and receivers located on the Rio Grande as to the commodities embraced in the order. There is no evidence to support a finding that the physical transportation facilities furnished by the Union Pacific between the northwest area, on the one hand, and points east of Denver are inadequate. There is abundant support, however, for the finding that the service is inadequate to patrons of the Rio Grande, located on the Rio Grande between Ogden on the west and Denver, Pueblo, and Trinidad on the east (not served by the Union Pacific between Ogden and Provo), who do not have in-transit privileges with respect to freight moving from the northwest area which is to be reshipped to points east of Denver, if under the law the lack of in-transit privileges may constitute "inadequacy". That is also true as to the service to shippers of marble and granite from Vermont and Georgia to initial points on the Rio Grande who need the in-transit privileges of partial unloading or processing en route, incident to reshipment to final destination points beyond Ogden in the northwest area. The foregoing inadequacies are based upon the premise that the lack of in-transit privileges constitutes inadequacy of service within the meaning of clause (b) of Sec. 15(4). The Union Pacific vigorously contends that it does not. This question presents the crux of this case. If, as the Union Pacific contends, in-transit rights and privileges are matters over which the Commission under the law has no control, the existence or granting of which is subject only to managerial discretion of the carrier, and relate only to economy or efficiency of transportation to the exclusion of considerations of adequacy of transportation, then the lack of in-transit privileges will not suffice as a proper basis for ordering "adequate" transportation. The argument is made in effect that since the transportation facilities are now available over the Union Pacific and the Rio Grande on the higher combination rates, the present nonexistence of in-transit privileges relates only to the cost or economy of transportation. Reference is made to excerpts from opinions which it is said support the conclusion that the Commission may not under its general regulatory power force a carrier to provide or establish in-transit privileges. The question has many ramifications. We are confronted only with determining whether a finding of inadequacy of transportation may be legally based upon the absence or lack of services which are incidents of and to in-transit privileges. If that be true, the Commission may order the establishment of through routes and joint rates, with their ordinary incidents—in-transit privileges—when such action is necessary in order to provide adequate transportation. We are convinced that the Commission does have that power. Pennsylvania R. Co. v. United States, 323 U.S.

588, 65 S.Ct. 543, 89 L.Ed. 478, Id., D.C., 54 F.Supp. 381.

But the inadequacy established by the evidence does not extend to shipments from the northwest area to initial destinations east of Denver. The same is true of shipments of monuments from Vermont and Georgia to points of initial destination in the northwest territory. Transportation service is now adequate between those points. There is ample evidence to support the finding that the establishment of the through routes and joint rates between the northwest area and points on the Rio Grande (not also served by the Union Pacific between Ogden and Provo), as to shipments which require in-transit privileges at points on the Rio Grande for reshipment to points east of Denver, will result in more economical transportation. Differences in mileage and other comparative factors are for the Commission to weigh, evaluate and determine. Its ultimate factual conclusion may not be overturned when supported by the evidence. But, again, there is no evidence that the service is inadequate or that more economical transportation service will result with respect to shipments from the northwest area to points between Ogden and Provo served by both the Union Pacific and the Rio Grande and to be reshipped to final points of destination east of Denver. The transportation facilities are shown by the evidence now to be adequate, with in-transit privileges between those points over the Union Pacific. And that service is as economical via the Union Pacific as it would be over the Union Pacific and the Rio Grande if the through route and joint rates were established. The evidence therefore sustains the finding of inadequacy and the need for more economical transportation only as to (1) carload shipments of commodities embraced in the Commission's order from points in the northwest territory destined to points of final destination east of Denver which require in-transit privileges at points on the Rio Grande; (2) shipments of granite and marble monuments from Vermont and Georgia to final destinations in the northwest territory which require in-transit privileges at points on the Rio Grande not also served by the Union Pacific. If the order had been so limited to the evidence it would eliminate short-hauling the Union Pacific except as to shipments requiring service which is now inadequate and which service the Union Pacific cannot now give. It would eliminate the charge made by the Union Pacific that the order was for the purpose of assisting the Rio Grande to meet its financial needs, and, more important, it would have rested squarely within the authority of clause (b) of Sec. 15(4).

The second finding, that the combination rates maintained by the Union Pacific and the Rio Grande are unduly prejudicial to shippers using or desiring to use the Rio Grande and unduly preferential to shippers and receivers using the Union Pacific to the extent they exceed the joint and through rates available to shippers located on the Union Pacific, is made for the purpose of bringing the order within the authorization of Sec. 3(1). Title 49 U.S.C.A. § 3(1). That section is as follows:

"Sec. 3(1) It shall be unlawful for any common carrier subject to the provisions of this part to make, give, or cause any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic, in any respect whatsoever; or to subject any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory or any particular description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever: *Provided, however,* That this paragraph shall not be construed to apply to discrimination, prejudice, or disadvantage to the traffic of any other carrier of whatever description."

The situation which this finding seeks to correct, simply stated, is that the shippers and receivers of the designated commodities located on the Rio Grande who do not have in-transit privileges and joint and through rates are at an economic disadvantage compared to shippers and receivers located on the route of the Union Pacific who do have joint and through rates and in-transit privileges.

If the prejudice and preference shown by the evidence falls within the prohibition of Sec. 3(1) the Commission may correct it irrespective of whether the factual situation authorizes the order under Secs. 15(3) and 15(4) heretofore considered. But the prejudice and preference prohibited by Sec. 3(1) relate to prejudice and preference shown by one carrier or a combination of carriers between the entities named in 3(1) which are served by the one carrier or the combination acting as one. · The prohibition of Sec. 3(1) is intended to prevent a carrier from giving preferences or advantages, over which the carrier has control, to one of the entities named and not to another. It does not apply to a situation such as this where the comparison of preferences and advantages or prejudices and disadvantages is between the entities named when they are located on the lines of different carriers not acting in concert or collusion. Although the factual situation in Central R. Co. of New Jersey v. United States, 257 U.S. 247, loc. cit. 259–260, 42 S.Ct. 80, loc. cit. 83, 66 L.Ed. 217, was different, the purpose of Sec. 3(1) was there stated as follows:

"What Congress sought to prevent by that section, as originally enacted was not differences between localities in transportation rates, facilities and privileges, but unjust discrimination between them by the same carrier or carriers. Neither the Transportation Act 1920, February 28, 1920, c. 91, 41 Stat. 456, nor any earlier amendatory legislation has changed, in this respect, the purpose or scope of § 3."

If the Commission could order through routes and joint rates between two or more competing railroads under Sec. 3 (1) merely because a shipper entity described in Sec. 3(1) located on one railroad had a transportation advantage over such an entity located on the other railroad, the prohibition of Sec. 15(4) would be practically emasculated. The evidence of preference, advantage, prejudice or disadvantage, under these circumstances, furnishes no basis for the order under Sec. 3(1).

The third finding, heretofore quoted, to the effect that the maintenance by the Union Pacific of joint rates with the Bamberger Railroad to and from points in the northwest area and points on the Bamberger line from Ogden to Salt Lake City, inclusive, while refusing to maintain joint rates with the Rio Grande on shipments from the northwest area to the points served by both the Rio Grande and the Bamberger Railroad from Ogden to Salt Lake City, inclusive, discriminates against the Rio Grande, is based on Sec. 3(4), which is as follows:

"Sec. 3(4) All carriers subject to the provisions of this part shall, according to their respective powers, afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines and connecting lines, and for the receiving, forwarding, and delivering of passengers or property to and from connecting lines; and shall not discriminate in their rates, fares, and charges between connecting lines, or unduly prejudice any connecting line in the distribution of traffic that is not specifically routed by the shipper. As used in this paragraph the term 'connecting line' means the connecting line of any carrier subject to the provisions of this part or any common carrier by water subject to part III."

The Bamberger Railroad is an electric line operating only from Ogden to Salt Lake City, serving those cities and

intermediate points. The Rio Grande serves all points served by the Bamberger. The criterion for determining unlawful discrimination under Sec. 3(4) is stated by the Commission at page 658 of its order as follows:

"A finding of discrimination under section 3(4) of the act must be supported by a showing that the transportation conditions are no less favorable over the routes alleged to be discriminated against than over the routes said to be preferred."

The Commission found there was no important dissimiliarity between the transportation conditions in connection with the Bamberger and those in connection with the Rio Grande. Upon this record that factual conclusion may not be disturbed. Section 3(4) clearly prohibits such discrimination. The Commission's order in this respect is valid under Sec. 3(4).

Considerable attention has been given by the Union Pacific in its brief to the action of the Commission in rejecting a portion of evidence offered by it in an attempt to show improper conduct in the preparation and presentation of the Rio Grande's case before the Commission. We do not find justification for serious consideration of that question.

## Findings of Fact

### I

The finding of the Commission that present transportation facilities between the northwest area and points of initial destination east of Denver are inadequate is not supported by the evidence, because present transportation facilities over the Union Pacific between such points are adequate. And the evidence shows that the establishment of joint rates and through service via the Union Pacific and the Rio Grande between the northwest area and points of initial destination east of Denver, Pueblo, and Trinidad would not make such service more economical, because the rates for such service would only equal the present rates via the Union Pacific between those points.

### II

The record supports the Commission's finding that present transportation service between the northwest area and points of initial destination on the Rio Grande (not also served by the Union Pacific between Ogden and Provo) is inadequate and also inefficient and uneconomical as to shipments of the commodities specified by the Commission from the northwest area to initial points of destination on the Rio Grande west of Denver, which require in-transit privileges enabling their reshipment on joint through rates to points of final destination east of Denver.

### III

The record supports the Commission's finding that present transportation service for granite and marble monuments, in carloads, originating in Vermont and Georgia, consigned to initial destination points on the Rio Grande, requiring unloading and in-transit privileges for continued movement to points in the northwest territory, is inadequate and uneconomical and that the establishment of joint rates and through service is necessary in order to provide adequate and more economic transportation for such shipments.

### IV

The evidence supports the finding that as to designated items of traffic moving from the northwest area, shippers and receivers of freight located on the Rio Grande are at an economic disadvantage compared with shippers and receivers of freight from the northwest area who are located on the Union Pacific. But there is no community of interest between the Union Pacific and the Rio Grande and hence there is no discrimination by the Union Pacific within the prohibition of Sec. 3(1).

### V

The evidence supports the finding of the Commission, referred to and quoted herein as Finding 3, that unlawful discrimination prohibited by Sec. 3(4) is being practiced by the Union Pacific in refusing to establish through routes and

joint rates with the Rio Grande comparable to those existing between the Union Pacific and the Bamberger Line on traffic moving from the northwest area to points served by both the Bamberger Line and the Rio Grande between Ogden and Salt Lake City.

## Conclusions of Law

### I

The absence of in-transit and other privileges involved herein, incident to through joint rates will, under the law, support a finding that transportation service without such services and privileges is inadequate within the meaning of Sec. 15(4). The evidence therefore supports the finding of the Commission that the establishment of through routes and joint rates between the Union Pacific and the Rio Grande is necessary in order to provide adequate and more economic transportation of the designated commodities in carloads originating in the northwest area, consigned to initial destination points on the Rio Grande west of Denver, Pueblo and Trinidad, which require in-transit privileges incident to reshipment to points east of Denver, Pueblo and Trinidad. As to such commodities the order of the Commission is valid under Secs. 1, 15(3) and 15(4) of the Act and does not violate the direction of Sec. 15(4) that reasonable preference be given the carrier which originates the traffic.

### II

The evidence supports the finding of the Commission that it is necessary, in order to provide adequate and more economic transportation of shipments of marble and granite monuments in carloads from points in Vermont and Georgia to points of final destination in the northwest territory, which require unloading and in-transit privileges at points on the Rio Grande incident to the continuation of the shipment to the northwest area, that through routes and joint rates be established between the Union Pacific and the Rio Grande as to such shipments.

### III

To the extent that the order of the Commission requires the establishment of through routes and joint rates between the Union Pacific and the Rio Grande on carload traffic moving from the northwest area to points on the Rio Grande, which traffic is to be reshipped to points east of Denver, but which is of such nature or character that it does not require stoppage-in-transit privileges, which are incident to in-transit privileges, and as to all traffic moving from the northwest area to points of original destination east of Denver, Pueblo or Trinidad, said order is not valid, because Sec. 15(4) constitutes a limitation on the power of the Commission to order establishment of through routes which will result in short-hauling the Union Pacific, unless that be necessary in order to provide, inter alia, adequate transportation. Since the evidence does not justify a finding of fact that the establishment of such routes and rates is necessary to provide adequate transportation for commodities of the character stated or to the destinations specified in this paragraph, that factual premise, essential to the validity of the order, is lacking.

### IV

To the extent the Commission requires the establishment of through routes and joint rates between the Union Pacific and the Rio Grande at Ogden on carload traffic moving from the northwest area to points between Ogden and Salt Lake City, inclusive, served by both the Rio Grande and the Bamberger Line, the order is valid for the purpose of removing an unlawful discrimination against the Rio Grande under Sec. 3(4) of the Act.

To the extent stated in the foregoing opinion, findings of fact, and conclusions of law, the order of the Commission will be enjoined. The cause is remanded to the Interstate Commerce Commission for such further proceedings as it may deem appropriate, consistent herewith.

JOHNSEN, Circuit Judge (dissenting).

The Commission has here used standards and criteria for the exercise of its power to compel through routes and joint rates, which I think are beyond the warrant of the statute. The majority opinion upholds in part the result which the Commission has so reached.

What the Commission purports to make the primary basis for its establishing of through routes and joint rates over the Rio Grande is "perishable food articles". Here, as taken from its Report, are the manner and perspective of its approach to the question.

"Growers [of perishable food articles in Idaho, located on the Union Pacific] * * * market such products throughout the United States. In order to get as wide a distribution as possible, those growers and other growers in the northwestern area [that part of Utah lying north of Ogden, and the States of Idaho, Montana, Oregon and Washington] need as many markets and outlets as possible." [1] 287 I.C.C. at page 642. To comprehend or evaluate that need, says the Commission, "it is necessary to consider the nature, extent and functioning of our intricate and far-flung commodity marketing system." P. 655. The importance, in our condition of growing population and national development, of having "a constantly expanding flow of diverse commodities" and "particularly articles of food" is emphasized. The comment is made that "A complex but efficient marketing system has been evolved to provide as orderly a distribution of food commodities as possible," and the truism is expressed that "Adequate transportation facilities and services are required for the proper functioning of the system." P. 656.

Then follows what seems to me to represent the crux of the Commission's concept and standard in what it did.

1. "Because of their generally perishable nature, food articles, such as fresh fruits and vegetables, frozen poultry, frozen foods, butter, eggs, ordinary livestock, and dried beans, must be moved to market with expedition and care, and *over as many routes as possible*. This requires that many routes be open in order that unnecessary interruptions of the free flow of such commodities may be avoided and that *as much flexibility as possible in the distribution process* be permitted." (Emphasis mine.) P. 656.

2. "A number of services, not only at origin and destination, but enroute, which are not usually required in the movement of ordinary traffic, must be provided for these perishable and semi-perishable commodities." In-transit privileges, "such as stopoff for partial unloading, *storing, or processing in transit*, or for feeding or grazing livestock in transit," are available at various points on the Union Pacific to through-shippers, on the basis of the joint rates applicable over that route, and similar privileges exercisable on the Rio Grande could be made available to such shippers, at a lower cost than under the present combination rates, by establishing competitive through routes and joint rates over that road, so that those desiring to have the benefit of these additional facilities would be able to enjoy them on the same basis as those on the Union Pacific. Because the use of such transit facilities on the Rio Grande is not available in the same manner as those on the Union Pacific, "The shippers in the originating area involved in this complaint with respect to these commodities are debarred from effective participation in the wide-

1. It should be noted that the situation covered by the Commission's order does not involve the matter of joint rates to intermediate points on the Rio Grande as final destinations. Joint rates already apply to such traffic. The question is one of through routes and joint rates for traffic having a billing origin and des-tination outside of Rio Grande territory, and for which the Rio Grande therefore would merely be serving as a "bridge" line only, while the Union Pacific, on whose branch lines most of the traffic originates, would be caused to lose a line-haul thereon of 975 miles.

spread system developed for the marketing of such commodities." P. 656.

3. The Commission does not attempt to explain how the failure of such through-shippers as a general class to have access to the transit privileges on the Rio Grande on the same rate basis as on the Union Pacific, can thus broadly and absolutely be declared to debar them "from effective participation in the widespread system developed for the marketing of such commodities." In the absence of such an explanation, and on the implication of what the Commission has precedingly said in its Report, as set out above, the only deduction that I am able to make is that the Commission regards all shippers of perishable commodities as having a right generally or abstractly, upon an expressed desire by any of them in a particular situation, to be given "as many routes as possible" and "as much flexibility as possible in the distribution process", because otherwise they will be "debarred from effective participation in * * * the marketing of such commodities."

In other words, whenever it is possible physically and practicably to open up a new or an additional through route for such commodities, the Commission apparently feels entitled to exercise its power to do so, in order to make available any increase in the amount of transit privileges en route which can be provided for such through-traffic, on the basis of simply declaring, as it in effect did here, that the previous through routes are inadequate, since they lack the additional transit privileges of the new carrier's route, which some shipper may desire or can solicitedly be persuaded to use, and on the basis of further holding that the other prerequisite of section 15(4) of the Act, 49 U.S.C.A. § 15(4), where the element of short-hauling another carrier is involved, as it is here, that such an added through-route must also provide "more efficient or more economic transportation" than that existing on the present through routes, can sufficiently be satisfied by merely resorting to the Commission's power under section 15(3) to prescribe joint rates and pointing out that joint rates necessarily in the situation will provide "more economic transportation", since they obviously are lower than the previous combination rates.

I have grave legal doubt whether the Commission's power to establish joint rates under section 15(3) has any relationship to the term "more economic transportation" in section 15(4), dealing with the Commission's right to open up through routes. Rather, it seems to me that the term "more economic transportation" in section 15(4) is intended to have reference to the elements of distance, time, equipment, cost of operation, territorial reach, and all those other quantitative and qualitative factors which are inherent in a transportational comparison from the standpoint of the interests of both the public and the carriers—and that the Commission's power to establish joint rates under section 15(3) is one which has application only after through routes exist or are established, without the right to use it as a factor under section 15(4) for satisfying the requirements of opening up a long-haul-depriving, additional through route.

But however this may be, I am at least convinced that, where the question is one, as here, of opening up, not an initial through route, but an additional one for the same through-traffic to the same ultimate destinations, the Commission's power to establish joint rates cannot be made to constitute the sole ingredient or content of the term "more economic transportation" under section 15(4), in the addition of another carrier's route as a mere "bridge" line for such traffic. If that be not so, then there is not any situation in which the Commission can not make a finding of "more economic transportation" for whatever additional through route it may undertake to open up, since in all cases joint rates necessarily, from their very nature, are lower than combination rates otherwise applying.

Let me add in summary that, if it can properly be held, as the Commission has

done here, that perishable commodities are entitled to "as many routes as possible" and "as much flexibility as possible in the distribution process," so that on this basis, and without regard to any other factor, any existing through route can be called inadequate, because it is possible to create additional transit privileges or facilities for such traffic by opening up another through route over another railroad, serving as a bridge line, and further such new route can be declared to provide "more economic transportation", because by placing joint rates in effect the cost of using such new through route for its transit facilities will be less than under the general combination rates previously existing, then the railroads of the country may as well forget section 15(4) entirely, as affording them any protection whatsoever against deprivation of their long hauls.

Here the opening up of a through route over the Rio Grande as a bridge carrier for the transcontinental freight involved will deprive the Union Pacific of a long haul of 975 miles upon such traffic as the Rio Grande is able to solicit away from it. But this is not the sole purport or effect of the Commission's order. If the order is upheld either in whole or in part, on the basis on which the Commission's result has been reached, the Commission can hereafter exercise its power to require through routes and joint rates from every connecting point in the country against every existing carrier, since every new through route necessarily will afford additional transit privileges and every joint rate necessarily will reduce the cost of using the new through

route as against the combination rate previously applicable.

Nor should one allow oneself to be blinded to what the real scope and significance of the Commission's reach here is. What it has purported to paint the picture of, in relation to its standard of "as many routes as possible" and "as much flexibility as possible in the distribution process" is, as previously indicated, "perishable food articles". But, it has, by means of some artificial classification, included ordinary livestock as a perishable food article (P. 656), saying merely, before doing so, that "We think, however, that the situation here as to livestock is no different from that portrayed as to certain other commodities with respect to the need for competitive routes over the Rio Grande via the Ogden gateway." And it has further held that a little monument dealer, located on the Union Pacific in Utah, is entitled to have established for him a through route and joint rates on the Rio Grande, in order to have the transit privilege available to him of unloading locally, here and there in Colorado, on a through rate basis, some individual monuments out of an estimated four-carload lot of monuments per year.[2]

All of this to me is but another attempt by the Commission to gain a new foothold, under another disguise, for the philosophy and position that it should have the right to put into effect as many new through routes as it deems advisable, without being required to give consideration to the question of short hauling another carrier. It has repeatedly asserted that viewpoint and sought to gain that

---

2. I shall not take the time to go into the details of this trivial monument situation, which the Commission characterized as one of "urgent need" (Page 638), except to comment that it is typical of the Commission's approach, result and intended reach. Why a little dealer, who wants to make local peddlings of 4 carloads of tombstones is entitled to have the Union Pacific join in giving him the opportunity to do so on a through rate basis is a bit beyond me. But more than this, if tombstones constitute a commodity that is entitled to this extreme transit privilege, on the same basis as perishable foods, then the Commission's purported basis of "as many routes as possible" and "as much flexibility as possible in the distribution process" for perishable foods is meaningless, and it seems rather apparent what this initial action of the Commission here portends for the transportation system generally of the country.

end. But Congress has never been willing to accede to that philosphy and position, and the courts have on a number of occasions had to strike down the Commission's efforts in that direction. All this is familiar history in the railroad world, and I shall not bother to go into it further here.

It is on the basis of the unqualified use of that standard here in relation to perishable commodities, and the attempt to get the camel's nose under the tent as to one or two other commodities also, in a smothered, beginning approach to an apparently wider future reach, that I would strike down the Commission's order. I think that anyone who reads the Commission's Report, in the light of what I have said, and stripped of all the confusion in which the Report has been wrapped, will have no convictional difficulty as to the implications which I have pointed out.

I do not mean to make any implication, nor do I here assume to pass judgment, on whether the Ogden gateway is in other manner or to other extent subject to being opened up. All I say is that the philosophy and standard of "as many routes as possible" and "as much flexibility as possible in the distribution process" can not be made the basis for overriding the short-hauling provisions of section 15(4), through the merry-go-round device of calling all transportation inadequate without the availability of every bit of transit privilege that exists on any connecting carriers aggregately, and of construing the term "more economic transportation" to mean nothing more than the difference between joint rates placed in effect and the combination rates previously existing.

The philosophy and standard which the Commission has used are unquestionably sound as a marketing principle, but the railroad transportation system of the country has never yet been relegated by Congress to the full impact of marketing principles alone. There is not a distributor of any commodity—including perishable foods—who, up to the time at least of the Commission's present order,

has had, or has been regarded as being entitled to have, as a matter of sound transportational concept, every avenue and facility that it is possible to open up for him, with a simple brushing aside of transportational conditions, realities and consequences, such as I think the Commission here did.

I have previously referred to the fact that most of the traffic that is here involved originates on the branch lines of the Union Pacific, and that on such of this traffic as the Rio Grande is able to solicit to use its route, the Union Pacific will lose a line haul of 975 miles. The Report of the Commission admits that "the extent to which the Union Pacific route is shorter than the route sought by the Rio Grande to and from points between which most of the traffic here concerned moves" is about 200 miles. Page 654. It also recognizes that the Rio Grande is a mountainous route, of higher grades, more circuity, and greater operational costs than the Union Pacific. "The total rise and fall in feet on the Rio Grande is 66.3 per cent greater than that of the Union Pacific. Other data as to physical characteristics of the two lines show that the Rio Grande line is less favorably situated than that of the Union Pacific. Traffic routed over the Rio Grande as a bridge line would require at least 24 hours additional time in transit than when routed over the Union Pacific, and would require one or two more terminal-yard services." Page 648.

All of these matters, however, the Commission lightly brushes aside, as not having relationship to the question of "more economic transportation" in the situation, and so leaving it free to hold, as above indicated, that the new through route provides "more economic transportation", because its joint rates necessarily are lower than the previously applicable combination rates. All that the Commission says, in brushing aside the transportational differences which I have set out, as not requiring consideration on the question of "more economic transportation" in the situation, is that, when they are spread over hauls of such great

lengths as are here involved, "they become relatively insignificant." Page 658.

The Report does not undertake to show what amount of traffic goes where. It merely says that "About 90 per cent of the traffic upon which joint rates are sought via Ogden and the Rio Grande moves to (Missouri River crossings and points east and southeast) and about 10 per cent to the Southwest." Page 626. How much terminates at the Missouri River crossing-points or at other midwestern destinations, the Report does not state. As to livestock, however, it certainly is a matter of common knowledge that the primary markets are Chicago, Omaha, Kansas City and some other Missouri River points. To each of these points, as well as to the Minneapolis and St. Louis markets, the record shows that a haul of 200 miles more, and a transportation time of at least 24 hours longer, as well as at least one or two more terminal-yard services, are involved over the Rio Grande route. I do not believe that without rational demonstration the Commission can say, except arbitrarily, that in relation to hauling distances of 1036 miles (Omaha) or 1153 miles (Kansas City) or 1524 miles (Chicago), the elements of difference which I have set out are so "relatively insignificant" as to be entitled to be ignored on the question of whether "more economic transportation" is being provided. And in the absence also of some demonstration or analysis of quantities and destinations as to the various other commodities involved, I do not believe that the Commission can be said to have any less arbitrarily brushed off the facts of the transportational and service differences existing, as related to the question of "more economic transportation" under the statute, than in the case of livestock, when it merely attempts to push all of the facts abstractly to a far-distant horizon, without establishment of the reality of that horizon for lumping purposes.

Incidentally, I also may add that what the Commission has here done as to livestock is a departure or exception from the long-established general livestock scheme, practice and policy which the Commission has previously recognized and accepted. In Livestock, Western District Rates, 176 I.C.C. 1, 190 I.C.C. 175, 190 I.C.C. 611, 200 I.C.C. 535, the Commission prescribed rates on livestock in western territory, predicated generally on the shortest routes over which carload traffic could be moved without transfer of lading, but the carriers were not required to maintain the rates over such routes where it would result in short hauling within the meaning of section 15(4) of the statute. In establishing the prescribed rates, the carriers limited their application, as the Commission itself has recognized, over routes which did not result in short hauling, and over other and longer routes provided higher rates, either by the addition of arbitraries or the application of the mileage scales over the longer routes, giving consideration to the distance involved. This the Union Pacific was willing to do in relation to the Rio Grande's route. It would seem to me that the upsetting of this general, established scheme, practice and policy as to livestock rates, in the present situation, apart from the other aspects of the question here involved as to the livestock, is entitled to some explanation on the part of the Commission, if it is to escape the implication of an arbitrary departure as against the Union Pacific in its long-hauling of livestock from the northwest territory, as related to the differential permitted to be created by other carriers generally in such situations.

This dissent is being written hastily, in order not to delay the filing of the majority opinion, and I shall accordingly not take the time to go into detail on other matters. I agree with the majority that the Commission had no right here to find a violation of section 3(1) of the Act against the Union Pacific and its connecting through-route carriers, but the basis for my view is not that adopted by the majority, that a discrimination under this section cannot at all exist, unless the complaining person or entity is located

upon the lines of the carrier or combination of carriers claimed to have committed the discrimination. I do not believe that this viewpoint is tenable on the language of section 3(1), nor on the expressions contained in St. Louis Southwestern Ry. Co. v. United States, 245 U.S. 136, 144, 38 S.Ct. 49, 62 L.Ed. 199, as well as on the plain, contrary assumptions made in Texas & Pacific Ry. Co. v. United States, 289 U.S. 627, 53 S.Ct. 768, 77 L.Ed. 1410. But on the factual elements that are involved in the present situation I do however not think that there exists any basis on which to declare the Union Pacific and its connecting through-route carriers guilty of unreasonable preference or unreasonable prejudice under section 3(1), in having refused to join with the Rio Grande to make the latter available as a bridge line for hauling through traffic at the same rate, over a 200-mile longer route, with a 66.3 per cent greater variation in grade, involving a 24-hour additional hauling time, and necessitating the furnishing of several more terminal-yard services. I do not believe that these facial railroad realities would permit of a finding of such a discrimination as was intended to be reached by section 3(1). If the Commission had attempted to predicate the relief which it here granted upon the existence of a violation of section 3(1), I am certain that its action resting on this basis alone could not on these facial realities be upheld. Only an escape from these facial realities, through a dissolution of them under the considerations open to the Commission in section 15(4), such as the Commission here attempted, could at all, in my opinion, on the facts of the situation, have furnished a basis for the prescribing of through routes and joint rates in relation to the existing conditions.

In the pattern of the Commission's apparent attempt to strike at as much in the present situation as possible, the Commission further, as noted in the majority opinion, required the Union Pacific to establish joint rates with the Rio Grande to and from the same points where it maintained joint rates with the Bamberger Railroad. The Report says: "The Bamberger operates, for about 36 miles, between Ogden and Salt Lake City, and it appears that there is no important dissimilarity between the transportation conditions in connection with the Bamberger and those in connection with the Rio Grande." P. 659. The brief of the Union Pacific argues pointedly that "No evidence was submitted concerning or comparing transportation conditions on the Bamberger's electric line between Ogden and Salt Lake City with conditions on the Rio Grande." The brief of the Commission makes no denial of the fact that no such evidence is contained in the record. The most that the Commission could properly have said, I think, was that it had not been made to appear by the evidence that there was any important dissimilarity in the conditions on the two roads. But the lack of any such evidence of dissimilarity could hardly afford a basis for a finding of similarity on the part of the Commission. This segment of the Commission's order is perhaps of relatively small importance in the present controversy. I refer to it simply as being characteristic or in the pattern of the loose and improper basis and manner in which it seems to me that the Commission has dealt with the entire situation.

I would strike down the Commission's order generally, on the basis and manner in which its result has been reached. In taking that position, however, I would again emphasize that I intend no implication that there may not exist some proper basis and some proper manner of reach as to some parts of the Ogden gateway situation. I have not allowed my mind to look at that avenue, in either one direction or the other. The pervading infirmities on which the Commission's present order seems to me to rest make it sufficient and compel me to halt my judicial consideration right there.