The **DENVER AND RIO GRANDE WESTERN RAILROAD COMPANY,** Plaintiff,

v.

**UNITED STATES of America and Interstate Commerce Commission, Defendants.**

Civ. A. No. 4492.

United States District Court D. Colorado.

Jan. 13, 1955.

As Corrected April 22, 1955.

Dennis McCarthy, Salt Lake City, Utah, and Robert E. Quirk, Washington, D. C. (Herbert M. Boyle, Denver, Colo., was with them on the brief), for plaintiff.

E. Riggs McConnell, Washington, D. C. (Stanley H. Barnes, Asst. Atty. Gen., James E. Kilday, Washington, D. C., and Donald E. Kelley, Denver, Colo., were with him on the brief), for the United States, defendant.

Samuel R. Howell, Washington, D. C. (Edward M. Reidy, Washington, D. C., was with him on the brief), for Interstate Commerce Commission, defendant.

Elmer B. Collins, Omaha, Neb., F. O. Steadry, Chicago, Ill., L. E. Torinus, Jr., St. Paul, Minn., and Eugene S. Davis, St. Louis, Mo. (F. J. Melia, Omaha, Neb., Warren H. Ploeger, St. Paul, Minn., Roland J. Lehman, Carson L. Taylor, Chicago, Ill., E. G. Knowles, Denver, Colo., W. R. Rouse, Omaha, Neb., Nye F. Morehouse, Chicago, Ill., M. L. Countryman, Jr., Edwin C. Matthias, St. Paul, Minn., J. C. Gibson, Chicago, Ill., and Joseph H. Miller, St. Louis, Mo., were with them on the briefs), for intervening railroad defendants.

H. Lawrence Hinckley, Ralph Sargont, Denver, Colo., John R. Barry, and Lee J. Quasey, Chicago, Ill. (Duke W. Dunbar, Frank W. Wachob, William T. Secor, Denver, Colo., E. R. Callister, Jr., Peter M. Lowe, Salt Lake City, Utah, Paul M. Hupp, Denver, Colo., Lowe P. Siddons, Dennis O'Rourke, Colorado Springs, Colo., and Alden T. Hill, Fort Collins, Colo., were with them on the briefs), for intervening plaintiffs.

William E. Doyle, Denver, Colo., Robert L. Simpson, Asst. Atty. Gen., Howard B. Black, Atty. Gen., and Bert L. Overcash, Lincoln, Neb. (Don Eastvold, Atty. Gen., C. W. Ferguson, Salt Lake City, Utah, James B. Patten, Helena, Mont., Clarence S. Beck, Lincoln, Neb., and Richard H. Shaw, Denver, Colo., were with them on the briefs), for intervening defendants.

Before PHILLIPS, Chief Circuit Judge, KNOUS, Chief District Judge, and SAVAGE, District Judge.

PER CURIAM.

This action was brought by the Denver and Rio Grande Western Railroad Company against the United States of America and the Interstate Commerce Commission under the Urgent Deficiencies Act, 28 U.S.C.A. §§ 2321–2325, to set aside and permanently enjoin, in part, an order of the Interstate Commerce Commission.

In August, 1949, the Rio Grande filed a complaint with the Interstate Commerce Commission against the Union Pacific and more than 200 other railroad defendants. In such complaint the Rio Grande alleged that the defendants have failed and refused to establish and maintain competitive joint rates on freight traffic with the Rio Grande: (a) via its Colorado and Utah gateways between places on or via the Union Pacific in Utah, north of Ogden, Idaho, Montana, Oregon, Washington and British Columbia and Colorado common points and points east thereof; and (b) between Utah common points and places on or via the Union Pacific in Utah, north of Ogden, Idaho, Montana, Oregon, Washington and British Columbia;

And that through routes now exist and have for many years existed for the interchange of traffic by the Rio Grande

with the Union Pacific at Provo, Ogden and Salt Lake City, Utah, and with the Union Pacific and certain other defendants at Denver, Colorado Springs, Pueblo, Walsenburg and Trinidad, Colorado, as to freight traffic

(a) between points on or via the Union Pacific in Utah, north of Ogden, Idaho, Montana, Oregon, Washington and British Columbia and Colorado common points and points east thereof; and

(b) as to freight traffic between Utah common points and points on or via the Union Pacific in Utah, north of Ogden, Idaho, Montana, Oregon, Washington and British Columbia;

And that the rates and charges applicable to such traffic between the points described via such through routes, with minor exceptions, are based upon the combination of the intermediate local or other rates, which rates and charges, in the aggregate, are substantially higher than the joint rates maintained by the defendants on similar competitive traffic between the same origin and destination places and territories which moves via the Union Pacific or via the Union Pacific and the other defendants, and that such combination rates are unjust, unreasonable and discriminatory, as compared with the competitive joint rates maintained by the Union Pacific or via the Union Pacific and the other defendants on like freight traffic via other competitive routes;

And that the failure and refusal of the Union Pacific and other railroad defendants to establish joint competitive through rates and charges applicable to the freight traffic between the points above described results in combination through rates which are excessive, unjust, unreasonable and constitute violations of §§ 1, 3 and 15 of the Interstate Commerce Act, 49 U.S.C.A. §§ 1, 3, 15 [1] and was and is contrary to the national transportation policy, since it deprives the public, shippers and the Rio Grande of the use of reasonable and available through routes and rail facilities at just, reasonable and non-discriminatory through joint rates, which were and are necessary and desirable in the public interest.

The Rio Grande prayed that the Commission enter an order requiring the Union Pacific Railroad and the other defendant railroads to establish and maintain for the future, just, reasonable, and non-discriminatory competitive joint rates on the freight traffic via the route of the Rio Grande through its Colorado and Utah gateways between (a) points on the Union Pacific and its connections in Utah, north of Ogden, Utah, and in Idaho, Montana, Oregon, Washington, and British Columbia, and (b) Colorado common points, such as Denver, Colorado Springs, Pueblo, Walsenburg, and Trinidad, Colorado, and points east thereof; and between (c) the points designated in (a); and (d) Utah common points.

By the challenged order entered on January 12, 1953, the Commission granted some but not all of the relief sought by the Rio Grande. 287 I.C.C. 611. In this action the Rio Grande seeks to have the court enjoin, set aside, annul and remand, with appropriate directions, that part of the order which denied relief sought by the Rio Grande. Union Pacific and other railroads and other persons have intervened with permission of the Court.

Section 1, Par. (4) of the Interstate Commerce Act in part provides:

"It shall be the duty of every common carrier * * * to establish reasonable through routes with other such carriers, and just and reasonable rates, fares, charges, and classifications applicable thereto; * * *. It shall be the duty of every such common carrier establishing through routes to provide reasonable facilities for operating such routes and to make reasonable rules and regulations with respect to their operation, and providing for reasonable compensation to those

1. Hereinafter called the Act.

entitled thereto; and in case of joint rates, fares, or charges, to establish just, reasonable, and equitable divisions thereof, which shall not unduly prefer or prejudice any of such participating carriers."

Section 3, Par. (4) of such Act in part provides:

"All carriers * * * shall, according to their respective powers, afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines and connecting lines, and for the receiving, forwarding, and delivering of passengers or property to and from connecting lines; and shall not discriminate in their rates, fares, and charges between connecting lines, or unduly prejudice any connecting line in the distribution of traffic that is not specifically routed by the shipper. * * *"

Section 13(1) of such Act in part provides:

"That * * * any common carrier, complaining of *anything done or omitted to be done* by any common carrier subject to the provisions of this part, in contravention of the provisions thereof, may apply to said Commission by petition, which shall briefly state the facts; whereupon a statement of the complaint thus made shall be forwarded by the Commission to such common carrier, who shall be called upon to satisfy the complaint, or to answer the same in writing, within a reasonable time, to be specified by the Commission. If such common carrier within the time specified shall make reparation for the injury alleged to have been done, the common carrier shall be relieved of liability to the complainant only for the particular violation of law thus complained of. If such carrier or carriers shall not satisfy the complaint within the time specified, or there shall appear to be any reasonable ground for investigating said complaint, it shall be the duty of the Commission to investigate the matters complained of in such manner and by such means as it shall deem proper." (Italics ours.)

Section 15(1) of such Act provides:

"That whenever, after full hearing, upon a complaint made as provided in section 13 of this part, * * * the Commission shall be of opinion that any individual or joint rate, fare, or charge whatsoever demanded, charged, or collected by *any common carrier or carriers* subject to this part for the transportation of persons or property as defined in the first section of this part, or that any individual or joint classification, regulation, or practice whatsoever of such carrier or carriers subject to the provisions of this part, is or will be unjust or unreasonable or unjustly discriminatory or unduly preferential or prejudicial, or otherwise in violation of any of the provisions of this part, the Commission is hereby authorized and empowered to determine and prescribe what will be the just and reasonable individual or joint rate, fare, or charge, or rates, fares, or charges, to be thereafter observed in such case, or the maximum or minimum, or maximum and minimum, to be charged, and what individual or joint classification, regulation, or practice is or will be just, fair, and reasonable, to be thereafter followed, and to make an order that the carrier or carriers shall cease and desist from such violation to the extent to which the Commission finds that the same does or will exist, and shall not thereafter publish, demand, or collect any rate, fare, or charge for such transportation other than the rate, fare, or charge so prescribed, or in excess of the maximum or less than the minimum so prescribed, as the case may be, and shall adopt the classification and shall conform to and observe the regulation or practice so prescribed."

At the threshhold we are confronted with a motion of the defendants to dismiss on the ground that the Rio Grande is without standing to maintain this suit. We hold that the Rio Grande has such standing. Since we so hold, by reason of our conclusion with respect to the existence of the through routes, the erroneous finding of the Commission on that issue, the erroneous application to the facts by the Commission of certain provisions of the Act, and the rights of the Rio Grande under the provisions of the Act, we shall state in detail our reasons for denying such motion, after a full consideration of the merits.

## I.

### The Merits

The Rio Grande operates approximately 2400 miles of railroad in Colorado, New Mexico and Utah. From its northern terminus at Ogden, Utah, it runs south to Salt Lake City and Provo, Utah, thence generally east to Dotsero, Colorado, where it divides, one branch going east to Denver, the other southeast to Pueblo. From Denver the line runs south through Colorado Springs to Pueblo and Trinidad. Other lines serving territories in southern Utah, northwest New Mexico and Southern Colorado are not of importance in this action.

The Rio Grande has interchange track connections and interchanges traffic with the Union Pacific at Denver, Colorado, and at Ogden, Salt Lake City and Provo, Utah; with the Southern Pacific at Ogden, and the Western Pacific at Salt Lake City. It has interchange track connections and interchanges traffic at Denver with the Rock Island, the Burlington, Santa Fe and the Colorado & Southern; at Colorado Springs with the Santa Fe and the Rock Island; at Pueblo with the Santa Fe, the Colorado & Southern and the Missouri Pacific; at Walsenburg with the Colorado & Southern and at Trinidad with the Santa Fe and the Colorado & Southern.

The Union Pacific, with its leased lines, operates as a single system. From Ogden, Utah, one line of the Union Pacific extends in a southwesterly direction through Salt Lake City and Provo and thence to Los Angeles. Another line extends northwest through Utah, Idaho, Oregon, Washington and Montana, serving what is referred to as the northwest territory, or the closed door territory. From Ogden, the Union Pacific runs generally easterly through Cheyenne and Denver, with eastern termini on the Missouri River at Omaha and Kansas City. At various points on its line it connects and interchanges traffic with the other intervening railroads.

The Union Pacific and other intervening railroads and the Rio Grande participate in through routes and joint rates with each other and with other carriers on transcontinental and other traffic, with certain exceptions. Joint rates generally do not apply in connection with the Rio Grande on traffic originating at or destined to points in Utah, north of Ogden, and in Idaho, Montana, Oregon and part of Washington. Joint rates apply on such traffic over the Union Pacific through Wyoming, but if routed over the Rio Grande to and from Ogden, the higher combination rate, consisting of the aggregate of local rates, applies.

The transcontinental traffic to and from this northwest territory ordinarily moves over the Union Pacific from or to Colorado or Missouri River gateways, rather than over the Rio Grande route. This is due, in part, to the refusal of Union Pacific to join with Rio Grande in establishing joint rates with respect to such traffic. The higher rates effectually close the Ogden gateway commercially and enable the Union Pacific to obtain the long haul on such traffic.

The power of the Commission to establish through routes and joint rates under § 15(3) is limited by § 15(4) of the Act, which declares that, except as provided in § 3 of the Act, a railroad may not be required without its consent to embrace in such route substantially less than the entire length of its railroad which lies between the termini of such

proposed through route, (a) unless such inclusion of lines would make the through route unreasonably long, as compared with another practicable through route which could otherwise be established, or (b) unless the Commission finds that the through route proposed is needed in order to provide "adequate, and more efficient or more economic, transportation". It is further provided that in prescribing through routes the Commission shall, so far as is consistent with the public interest and subject to the foregoing limitations in clauses (a) and (b), give reasonable preference to the carrier which originates the traffic. The section further provides that no through routes and joint rates applicable thereto shall be established for the purpose of assisting any carrier to meet its financial needs. This section was designed to restrict the power of the Commission to establish through routes which would short haul a carrier without its consent.

Rio Grande contended at the hearing before the Commission, and contends here, that the routes over which joint rates are sought were in existence and open to traffic at combination rates, and that the Commission was not called upon to establish through routes, and, therefore, limitations on its power to do so, imposed by § 15(4), are not applicable and need not be considered. It urged that the principal task of the Commission was to determine whether the through rates resulting from the combination or aggregate of intermediate rates over such existing through routes are unjust, unreasonable or discriminatory, in violation of §§ 1 and 3 of the Act, and contrary to the national transportation policy.

The Commission recognized that the first question for its determination "is whether or not the present routes by way of the Ogden gateway constitute 'through routes' as that term is used in section 15(3) and (4) of the Act." Only five of the ten participating members of the Commission joined in the report and order of the Commission, wherein it was first determined that through

routes were not in existence over the Rio Grande in connection with the Union Pacific through the Ogden gateway. Having reached this conclusion, the Commission proceeded upon the assumption that any order requiring the establishment of such through routes and joint rates over them must be grounded on findings, as specified in § 15(3) and (4). Thus limited in its further consideration of the case, the Commission entered its order:

"That it is necessary and desirable in the public interest, in order to provide adequate and more economic transportation, that through routes, and joint rates over such routes the same as apply over the Union Pacific and its connecting lines, defendants herein, be established via Ogden or Salt Lake City, in connection with the Rio Grande, on granite and marble monuments, in carloads, from origins in Vermont and Georgia to destinations in the excluded territory in the northwest are as previously described herein, and on ordinary livestock, fresh fruits and vegetables, dried beans, frozen poultry, frozen foods, butter, and eggs, in carloads, from origins in the excluded territory to destinations in the United States south and east of a line drawn along the southern boundary of Kansas thence the eastern boundary of Kansas to but not including Kansas City, thence immediately west of points on the Missouri River from Kansas City, Kansas, to Omaha, thence immediately north of points on the route of the Union Pacific and the Chicago & North Western from Omaha to Chicago, including destinations in the Lower Peninsula of Michigan and in Oklahoma and Texas."

In all other material respects the relief requested by the Rio Grande was denied.

This very brief and sketchy statement of the case will suffice, since we rest our decision upon a narrow ground. We are of the opinion that the

finding of the Commission that there are at present no through routes over the Rio Grande via the Ogden gateway is not supported by substantial evidence. It is our view that the Commission erred as a matter of law in reaching the conclusion, upon a consideration of undisputed facts, that such through routes are not in existence. This erroneous, self-imposed restriction upon its authority to establish joint rates obviously prejudiced the entire proceeding.

The undisputed evidence bearing upon the crucial question of existing through routes must be summarized. In 1897, the Union Pacific established joint through competitive rates with the Rio Grande to and from points in the northwest area through Ogden. These rates were in effect until canceled by Union Pacific in 1906 from and to some points and in 1912 from and to remaining points. But the through routes were not closed.

Counsel for Union Pacific expressed the opinion at the hearing before the Commission, in response to interrogation by Chairman Alldredge, that the cancellation of the joint rates did not close the through routes and that shippers were free to route via the Rio Grande if they wanted to pay more.

The principal traffic witness of the Union Pacific testified at the hearing that a shipper who was willing to pay the higher combination rate had the right to specify under § 15(8) of the Act a route via the Rio Grande. It should be observed that this right exists only when through routes and through rates have been established. This witness further testified that some joint through rates are now published in a Union Pacific tariff for application to shipments of sheep and goats from the northwest area via Ogden and the Rio Grande to points on the Missouri River and east thereof.

A continuous use of the Rio Grande route in the movement of traffic to and from the closed door area at through combination rates, without objection of the Union Pacific or participating railroads, is shown by the evidence, although the volume of traffic involved is comparatively small. In 1948, which was selected as a representative year, 37 carload shipments were made on through bills of lading from the northwest area to destinations on the Rio Grande in Utah and Colorado via Ogden or Salt Lake City. All of these shipments originated on the Union Pacific or its connections, but none moved to any destination east of Colorado common points. In the same year, 18 carload shipments were made west bound on through bills of lading from points east and southwest over connecting lines and the Rio Grande to Salt Lake City or Ogden and the Union Pacific to destinations in the northwest area. In addition, 21 carload shipments moved on through bills of lading from various eastern points to destinations in the northwest area, which were routed over the Rio Grande and Union Pacific, were held by the Rio Grande at Denver or Pueblo for change of the routing because the joint through rates were not applicable. The traffic movement to and from the northwest area over the Rio Grande through the Ogden gateway on through bills of lading and at through rates was substantially the same in years prior to 1948 and continued into 1949, until the date of the Commission hearings.

From November, 1942, to August, 1945, a number of shipments were diverted under service orders issued by the Commission from the regularly used routes to the Rio Grande route. During World War II mixed trains of troops in passenger cars and of military supplies in freight cars moved from eastern and southern points on through billing over the Rio Grande via Ogden and Union Pacific to the closed door area. These trains were not routed under service orders issued by the Commission. In 1949, when the main line of the Union Pacific in Wyoming was blocked by snow, the traffic was diverted over the Rio Grande between Denver and junctions with the Union Pacific in Utah.

These latter movements were made under emergency conditions and admittedly do not tend to establish an ordinary course of business between the carriers involved, but the Commission did not invoke its authority under § 15(4) of the Act to establish temporary through routes which indicates that the Commission assumed that through routes were already in existence.

■■ It is well settled that a joint rate is not essential to the existence of a through route. The rate which applies over a through route may be the aggregate of separate rates fixed independently by the several carriers participating in the through route. St. Louis-Southwestern R. Co. v. United States, 245 U. S. 136, 139, 38 S.Ct. 49, 62 L.Ed 199. Thompson v. United States, 343 U.S. 549, 556, 72 S.Ct. 978, 982, 96 L.Ed. 1134. In Thompson v. United States, supra, the court defines a through route as follows:

"* * * The statutory term 'through route,' used throughout the Interstate Commerce Act, has been defined by this Court as follows:

" 'A "through route" is an arrangement, express or implied, between connecting railroads for the continuous carriage of goods from the originating point on the line of one carrier to destination on the line of another. Through carriage implies a "through rate." This "through rate" is not necessarily a "joint rate." It may be merely an aggregation of separate rates fixed independently by the several carriers forming the "through route"; as where the "through rate" is "the sum of the locals" on the several connecting lines or is the sum of lower rates otherwise separately established by them for through transportation. Through Routes and Through Rates, 12 I.C.C. 163, 166.'

* * * * *

"In short, the test of the existence of a 'through route' is whether the participating carriers hold themselves out as offering through transportation service. Through carriage implies the existence of a through route whatever the form of the rates charged for the through service."

While the foregoing definition of "through route" compels us to conclude that the through routes contended for by Rio Grande were in existence, the Commission relied on the Thompson case in reaching its decision that through routes were not in existence. But the facts in the Thompson case are in striking contrast with the facts in this case. There, the question was whether a route from Lenora, Kansas, via Missouri-Pacific to Concordia, Kansas, and thence via Burlington to Omaha was a through route. No evidence was presented that any shipment had ever been made from Lenora to Omaha via the Burlington or that the carriers had ever offered through service over that route.

In our case, through routes and joint rates were established in 1897 and the joint rates remained in effect for some fifteen years. While the joint rates were canceled by Union Pacific, nothing was ever done to close the routes and diminished traffic continued to move over the same through routes at the higher through combination rates. Moreover, joint rates were continued in effect as well as through routes in respect to the shipment of sheep and goats from the closed door area through Ogden over the Rio Grande to the Missouri River and beyond. The Union Pacific and other participating railroads have issued through bills of lading, thereby recognizing the through route status. Shipments were diverted from the Union Pacific over the Rio Grande under emergency conditions without having the Commission authorize temporary through routes, which suggest that both the Union Pacific and the Commission assumed the existence of through routes.

The Commission stated in its report and order that "The Ogden gateway routes are not considered as open or through routes commercially, but as

routes that are closed to shippers because of the higher rates applicable." Then follows a statement that the establishment of joint competitive rates would result in such routes becoming "effective through routes, a character which they do not now possess." Thus, it appears that the Commission reasoned that the closing of the routes in a commercial sense by applying the higher combination rates terminated the through routes. But, it was held to the contrary in Virginian Railway Co. v. United States, 272 U.S. 658, 47 S.Ct. 222, 71 L.Ed. 463. There, of 99 coal mines located on the line of the Virginian, 45 enjoyed through routes and joint rates to the West because of certain trackage arrangements entered into between the Virginian and the Chesapeake & Ohio. As to other complaining mines, the court said, 272 U.S. at page 661, 47 S.Ct. at page 223:

> "* * * But that route is closed commercially, because these two carriers have not established any joint rates to the West from any of these 54 mines; and the combination of the Virginian's local rate from the mines to the junction with the Chesapeake & Ohio's rates from the junction to the West results in charges so high as to be prohibitive. * * *"

In discussing the attack made on the order of the Commission fixing joint non-discriminatory rates, the court stated 272 U.S. at page 666, 47 S.Ct. at page 225:

> "* * * The Virginian contends that the order is void because the Commission directed the establishment of through routes and joint rates without finding that they are necessary in the public interest. Such a finding is essential to the validity of an order under section 15(3). But the order here in question was not sought or made under section 15(3), and does not direct the establishment of through routes and joint rates. Through routes to the West were already in existence. And there

were through rates by combination. (Citing cases.) The fact that the combination rates were excessive constituted the only obstacle to the movement."

The intervening railroads argue that Rio Grande had the burden of proving, in order to show the existence of the through routes contended for, an actual movement of traffic between every point in the northwest area and every point in the United States on every railroad east of a north and south line drawn roughly along the eastern boundary of Colorado. They point out that there are some 2,900 railroad stations in the northwest area and some 30,000 stations in the area east of Colorado and that there are undoubtedly hundreds of thousands of through routes available in the published tariffs between the thousands of stations in the involved area of which Rio Grande claims to be a part. This question was not considered by the Commission, and we do not reach it here. In our view, the uncontradicted evidence clearly established the existence of through routes to and from points on the Union Pacific in the northwest area and the Rio Grande via the Ogden gateway to and from Colorado common points, the Missouri River gateways and beyond. Since the case must be remanded to the Commission for a new hearing, we believe that the Commission should initially pass on the question of whether the burden is on the Rio Grande to show some actual movement of traffic on through billing over each of the possible routes between the thousands of stations in the involved areas. It might be mentioned in passing that the court in the Virginian Railway Co. case concluded that "through routes to the West were already in existence", without apparent direct proof of transportation of freight from all points on the Virginian to all points in the west via the Chesapeake & Ohio.

■ The contention of the intervening railroads that we are not authorized to enter an order remanding the case to the Commission with appropriate in-

structions is refuted by the recent order entered by the Supreme Court in Secretary of Agriculture v. United States, 347 U.S. 645, 74 S.Ct. 826, 98 L.Ed. 1015.

## II

### The Motion to Dismiss

We have concluded that under the evidence before the Commission the existence of through routes via the Rio Grande was clearly established, as a matter of law, and that the Commission erred, as a matter of law, in not finding the existence of such through routes.

We further conclude that the Commission erred as a matter of law in applying the limitations of § 15(4) with respect to the establishment of through routes, in determining whether the Union Pacific and the other defendant railroads should be required to establish and maintain for the future just, reasonable and nondiscriminatory competitive joint rates under the provisions of §§ 1(4), 3(4), 15(1) and 15(3).

█ The duties and powers of the Commission, with respect to the relief sought by the Rio Grande, are clearly provided in §§ 1(4), 3(4), 15(1) and 15(3) of the Act. The right of the Rio Grande to file its complaint with the Commission and seek the relief therein prayed for is clearly given by § 13 of the Act. Under the Act, a carrier is as fully entitled to non-discriminatory treatment as a shipper. See Chicago Junction Case, 264 U.S. 258, 267, 44 S. Ct. 317, 68 L.Ed. 667, which cites with approval Pennsylvania Co. v. United States, 236 U.S. 351, 35 S.Ct. 370, 59 L.Ed. 616, where the complainant sought relief under § 3 of the Act.

█ The fact that the portion of the order here assailed was negative in character no longer affords a ground for the denial of judicial relief. See Rochester Telephone Corp. v. United States, 307 U.S. 125, 135–143, 59 S.Ct. 754, 83 L.Ed. 1147; Mitchell v. United States,

313 U.S. 80, 92, 93, 61 S.Ct. 873, 85 L. Ed. 1201.

The negative portion of the order required no affirmative action by the Rio Grande and took nothing away from the Rio Grande which it already had, and, if considered solely from those points of view, the order caused no pecuniary loss to the Rio Grande.

If the Rio Grande, in the proceeding before the Commission, established its right to the relief prayed for, it was entitled to an order establishing just and reasonable and non-discriminatory through rates and equitable divisions thereof, and a removal of the discrimination resulting from the existing through rates, which were a combination of intermediate or local rates, and the denial of such relief was the denial of a right given by the Act to have such just and reasonable through rates established.

The Rio Grande was entitled, as a matter of law, to have the Commission find that such through routes had been established, and, in passing on whether the defendants should be required to establish and maintain future just, reasonable and non-discriminatory competitive joint rates, to have the Commission apply the provisions of §§ 1(4), 3 (4), 15(1) and 15(3) of the Act, free of any of the limitations imposed by § 15(4) with respect to establishing through routes.

█ If the Rio Grande, on its showing before the Commission and an application of the provisions of §§ 1(4), 3(4), 15(1) and 15(3), was entitled to an order requiring the establishment and maintenance of such joint rates for the through routes which we hold had been established, then necessarily the denial of the order prayed for deprived the Rio Grande of a pecuniary gain to which it was entitled. This, because the granting of the relief undoubtedly would have resulted in a large increase of traffic via the Rio Grande and in its operating income, and,

no doubt, in its net earnings.[2] More succinctly stated, if the Rio Grande, under the facts established by the evidence before the Commission, and the application of the provisions of §§ 1(4), 3(4), 15(1) and 15(3) of the Act, was entitled to an order requiring the defendant railroads to establish such joint rates, the denial of that right resulted in pecuniary injury to the Rio Grande.

■ Where an order of the Commission denies a right given to a carrier by the Act, and the denial of such right adversely affects the revenues of the carrier, causing it to suffer pecuniary injury, such carrier has a right to a judicial review of the order.[3]

■ While it is our view that the denial of the relief here challenged will result in pecuniary injury to the Rio Grande, we do not think such injury is essential to the right to judicial review. In Mitchell v. United States, 313 U.S. 80, 61 S.Ct. 873, 85 L.Ed. 1201, Mitchell brought a proceeding before the Commission in which he alleged that the Chicago, Rock Island and Pacific Railway Company, in its purported compliance with an Arkansas statute, requiring segregation of the races during transportation did not provide as desirable accommodations for colored as for white passengers traveling in Arkansas over its line, which resulted in unreasonable charges and unjust discrimination against and undue prejudice to colored passengers in violation of §§ 1, 2, 3, and 13 of the Act and the Fourteenth Amendment. The only relief sought was the removal and avoidance in the future of the alleged discrimination and prejudice in the furnishing of accommodations. The Commission, while holding that the matters complained of were prohibited by § 3(1) of the Act, denied the relief prayed for. Mitchell then brought an action in the District Court of the United States for the Northern District of Illinois to set aside the Commission's order. In passing on whether Mitchell had standing to maintain the action, the Supreme Court said, 313 U.S. at pages 92 and 93, 61 S.Ct. at page 876:

"*First.*—The Commission challenges the standing of appellant to bring this suit. We find the objection untenable. This question does not touch the merits of the suit, but merely the authority of the District Court to entertain it. The fact that the Commission's order was one of dismissal of appellant's complaint did not foreclose the right of review. Appellant was an aggrieved party and the negative form of the order is not controlling. Rochester Telephone Corp. v. United States, 307 U.S. 125, 143, 59 S.Ct. 754, 763, 83 L.Ed. 1147.

"Nor is it determinative that it does not appear that appellant intends to make a similar railroad journey. He is an American citizen free to travel, and he is entitled to go by this particular route whenever he chooses to take it and in that event to have facilities for his journey without any discrimination against him which the Interstate Commerce Act forbids. He presents the question whether the Act does forbid the conduct of which he complains.

"The question of appellant's right to seek review of the Commission's order thus involves the primary question of administrative authority, that is, whether appellant took an appropriate course in seeking a ruling of the Commission. The established function of the Commission gives the answer. The determination whether a discrimination by an interstate carrier is unjust and unlawful necessitates an in-

2. The Union Pacific asserts that the granting of the relief prayed for would result in a large loss of traffic and a large reduction of earnings by the Union Pacific.

3. The Chicago Junction Case, 264 U.S. 258, 266, 267, 44 S.Ct. 317, 68 L.Ed. 667.

quiry into particular facts and the practice of the carrier in a particular relation, and this underlying inquiry is precisely that which the Commission is authorized to make. As to the duty to seek a determination by the Commission in such a case, we do not see that a passenger would be in any better situation than a shipper. Texas & Pacific Ry. Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553; Robinson v. Baltimore & Ohio R. Co., 222 U.S. 506, 32 S.Ct. 114, 56 L.Ed. 288; Mitchell Coal [& Coke] Co. v. Pennsylvania R. Co., 230 U.S. 247, 33 S.Ct. 916, 57 L.Ed. 1472; Morrisdale Coal Co. v. Pennsylvania R. Co., 230 U.S. 304, 33 S. Ct. 938, 57 L.Ed. 1494; General American Tank Car Corp. v. El Dorado Terminal Co., 308 U.S. 422, 60 S.Ct. 325, 84 L.Ed. 361.

"The District Court had jurisdiction to review the action of the Commission and the question on that review was whether that action was in accordance with the applicable law."

There, Mitchell suffered no pecuniary injury, but the court had no difficulty in concluding that he had a right to maintain the proceeding before the Commission, that he was an aggrieved party, and that he was entitled to judicial review. See, also, Henderson v. United States, 339 U.S. 816, 823, 70 S.Ct. 843, 94 L.Ed. 1302.

Here, the Rio Grande sought an order compelling the defendant railroads to perform their statutory duty to establish just and reasonable joint rates, fares, and charges over through routes, and if it was entitled to such an order, then it was immediately and directly affected and suffered discrimination by the refusal of the Commission to direct the defendant railroads to comply with the statutory mandate.

We think the cases relied on by the defendants are distinguishable.

Edward Hines Yellow Pine Trustees v. United States, 263 U.S. 143, 44 S.Ct. 72, 73, 68 L.Ed. 216, did hold that in order for the plaintiffs to maintain that action it was necessary for them to show that the order subjected them "to legal injury, actual or threatened", but the complainants there sought the continuation of a so-called penalty charge of $10 per car per day on lumber held at reconsignment points. The court said that the plaintiffs had no absolute right to require carriers to impose penalty charges and that plaintiffs' right was "limited to protection against unjust discrimination." Here, under the facts alleged and the proof before the Commission, the continuance of existing rates and charges over the through routes results in discrimination adversely affecting the Rio Grande and shippers over its lines. In the Chicago Junction Case, supra, the court distinguished between an incident of more effective competition and injury inflicted by denying equality of treatment. Just, reasonable, and non-discriminatory joint rates is the equality of treatment which the Rio Grande here seeks.

In Alexander Sprunt & Son, Inc., v. United States, 281 U.S. 249, 50 S.Ct. 315, 74 L.Ed. 832, the Interstate Commerce Commission entered an order directed to the railroads operating in Oklahoma, Arkansas, Texas, and Louisiana, which required them to remove in a prescribed manner, undue prejudice and preference caused by their rates on cotton shipped from interior points to Houston and other ports on the Gulf of Mexico. Two actions were brought, one by Sprunt & Son and one by the Texas & New Orleans Railroad Company and other carriers, to enjoin the enforcement of the order. Upon final hearing, the District Court sustained the validity of the order and entered a decree dismissing the bills. None of the carriers appealed from the decree. Sprunt & Son appealed. The court held that the issue of undue prejudice and unjust preference which had been passed upon by the Commission had become moot, because most of the carriers never sought to annul the order and that the carriers who

joined in the suit to set it aside had voluntarily severed themselves from the shipper, who objected to it. With respect to the right of Sprunt & Son to maintain the action, the court, 281 U.S. at pages 254, 255, 50 S.Ct. at page 317, said:

" * * * We are of opinion that appellants have no standing, in their own right, to make this attack. In so far as the order directs elimination of the rate differential previously existing, it worsened the economic position of the appellants. It deprived them of an advantage over other competitors of almost 3.5 cents per hundred pounds. The enjoyment of this advantage gave them a distinct interest in the proceeding before the Commission under section 3 of the Interstate Commerce Act. For, their competitive advantage was threatened. Having this interest, they were entitled to intervene in that administrative proceeding. * * * But that interest alone did not give them the right to maintain an independent suit, to vacate and set aside the order. Such a suit can be brought by a shipper only where *a right of his own is alleged to have been violated by the order.* * * * In the case at bar, the appellants have no independent right which is violated by the order to cease and desist. *They are entitled as shippers only to reasonable service at reasonable rates and without unjust discrimination. If such service and rates are accorded them, they cannot complain of the rate or practice enjoyed by their competitors or of the retraction of a competitive advantage to which they are not otherwise entitled.* The advantage which the appellants enjoyed under the former tariff was merely an incident of, and hence was dependent upon, the right, if any, of the carriers to maintain that tariff in force and their continuing desire to do so." (Italics ours.)

Here, again, the court recognized that mere deprivation of a competitive advantage was not enough and that they were only entitled to reasonable service at reasonable rates and without unjust discrimination. Here, the very thing the Rio Grande seeks is not a mere competitive advantage, but the establishment of just and reasonable through rates and the removal of unjust discrimination, which will result in pecuniary profit to the Rio Grande and the deprivation of which would prevent the Rio Grande from enjoying increased traffic and increased earnings.

In Pittsburgh & West Virginia Railway Co. v. United States, 281 U.S. 479, 50 S.Ct. 378, 74 L.Ed. 980, the Commission entered an order authorizing the New York Central Railroad and other rail carriers to join in establishing a union passenger station at Cleveland, through a subsidiary, Cleveland Union Terminals Company. The Wheeling & Lake Erie Railway Company had for some years owned and maintained an independent passenger station at Ontario Street, in Cleveland, in the line of the easterly approach to the proposed union terminal. It was apparent that either ownership of or an easement in the Wheeling's site would be indispensable in order to provide the necessary easterly approach to the terminal. Wheeling consented to sell its site and become a tenant in the new terminal. Contracts were made embodying this plan, subject to approval of the Interstate Commerce Commission. Thereupon, Wheeling filed before the Commission two applications for certificates of public convenience and necessity, one permitting it to abandon its Ontario Street station, and the other authorizing it to use the facilities of the union terminal, and pending its completion to use the facilities of the station of the Erie Railroad and the tracks of the Big Four.[4] Pittsburgh & West Virginia Railway, a minority stockhold-

4. Cleveland, Cincinnati, Chicago & St. Louis Ry. Co.

er and connecting carrier of the Wheeling, intervened in opposition to the applications. It opposed them on the ground that the Ontario Street station was ample for both the present and future needs of the Wheeling and that the contracts were disadvantageous to the Wheeling in certain particulars. The Commission found the public convenience and necessity would be served by the granting of both applications and accordingly issued its certificates as prayed for. Pittsburgh & West Virginia Railway then brought an action in the District Court of the United States for the Northern District of Ohio to set aside and annul the order of the Commission. The Supreme Court held that the order did not affect Pittsburgh & West Virginia as a carrier and that the claim that the order threatened Wheeling's financial stability and Pittsburgh & West Virginia's financial interest as a minority stockholder was not sufficient to show a threat of the legal injury necessary to entitle it to bring a suit to set aside the order. The court, 281 U.S. at page 487, 50 S.Ct. at page 381, said: "* * * The injury feared is the indirect harm which may result to every stockholder from harm to the corporation", and that the interest of Pittsburgh & West Virginia was insufficient to give it standing to bring the action.

In Moffat Tunnel League v. United States, 289 U.S. 113, 53 S.Ct. 543, 77 L. Ed. 1069, the Commission had entered an order authorizing the Denver and Rio Grande Western Railroad Company by stock purchase to acquire control of the Denver and Salt Lake Railway Company, called the Moffat Road. In the proceeding before the Commission the Moffat Tunnel Improvement District and the Public Utilities Commission of Colorado had intervened and they brought an action in the District Court of the United States for the District of Delaware to set aside the Commission's order. In holding that the plaintiffs did not have standing to maintain the suit, the Supreme Court said, 289 U.S. at page 119, 53 S.Ct. at page 545:

"'* * * the complaint must show that plaintiff has, or represents others having, a legal right or interest that will be injuriously affected by the order. Edward Hines Yellow Pine Trustees v. United States, 263 U.S. 143, 148, 44 S.Ct. 72, 68 L.Ed. 216; [Alexander] Sprunt & Son v. United States, 281 U.S. 249, 254, 50 S.Ct. 315, 74 L.Ed. 832; Pittsburgh & West Virginia Railway Co. v. United States, 281 U. S. 479, 486, 50 S.Ct. 378, 74 L.Ed. 980. Plaintiffs have failed to show that they are so qualified. Their interest is not a legal one. It is no more than a sentiment, such as may be entertained by members of the public in the territory west of Craig, that the improvement of transportation facilities authorized by the Commission will lessen the possibility of construction by a rival of the Rio Grande of an extension of the Moffat to Utah common points."

The Pittsburgh & West Virginia Railway Co. case and the Moffat Tunnel League case are obviously distinguishable from the instant case.

With respect to cases relied on by the defendants, the statement by the court in Youngstown Sheet & Tube Co. v. United States, 295 U.S. 476, 55 S.Ct. 822, 823, 79 L.Ed. 1553, is apposite. "* * * The authorities cited by the appellees are to be distinguished on the ground that the plaintiffs either had no legal interest or capacity to sue or failed to allege that the rates under attack were *unreasonable or discriminated against them*." (Italics ours.) Here, the existing rates are attacked by the Rio Grande on the ground that they are unjust, unreasonable, and discriminatory as against the Rio Grande and shippers on its line, deny them equality of treatment, and cause injury to them. It is urged that to maintain the action, equitable grounds for relief must be alleged. But, it should be remembered that in the Rochester Telephone Case, the court, 307 U.S. at page 142, 59 S.Ct. at page 763, said:

"* * * An action before the Interstate Commerce Commission is akin to an inclusive equity suit in which all relevant claims are adjusted. An order of the Commission dismissing a complaint on the merits and maintaining the *status quo* is an exercise of administrative function, no more and no less, than an order directing some change in status. The nature of the issues foreclosed by the Commission's action and the nature of the issues left open, so far as the reviewing power of courts is concerned, are the same. Refusal to change an existing situation may, of course, itself be a factor in the Commission's allowable exercise of discretion. In the application of relevant canons of judicial review an order of the Commission directing the adoption of a practice might raise considerations absent from a situation where the Commission merely allowed such a practice to continue. But this bears on the disposition of a case and should not control jurisdiction. * * *"

Moreover, in overruling Proctor & Gamble Co. v. United States, 225 U.S. 282, 32 S.Ct. 761, 56 L.Ed. 1091, the court, 307 U.S. at page 136, 59 S.Ct. at page 760, in the Rochester Telephone Case, supra, observed that the shipper in that case "was within the express language of Congress authorizing suits 'to enjoin, set aside, annul, * * * any order of the Interstate Commerce Commission.' "

In the instant case, the Rio Grande, in its complaint, alleges that it was without adequate remedy at law. Clearly, the Rio Grande can maintain no other action which will give it adequate relief or prevent injury to it.

Accordingly, we conclude that the Rio Grande had standing to maintain the action.

The order in so far as it denied relief to the Rio Grande will be annulled and set aside and the cause remanded to the Commission for further proceedings in conformity with this opinion.