DENVER & RIO GRANDE WESTERN RAILROAD
CO. *v.* UNION PACIFIC RAILROAD CO. ET AL.

NO. 117.

Argued April 23–24, 1956.—Decided June 11, 1956.

*Frank E. Holman* argued the causes for the Denver & Rio Grande Western Railroad Co. With him on the brief were *Robert E. Quirk* and *Dennis McCarthy.*

*Elmer B. Collins* argued the causes for the Union Pacific Railroad Co. et al. With him on the brief were *L. E. Torinus, Roland J. Lehman, Eugene S. Davis, James C. Wilson, W. R. Rouse, Lowell Hastings, Edwin C. Matthias, M. L. Countryman, Jr., J. C. Gibson* and *John L. Davidson, Jr.*

*Robert W. Ginnane* argued the causes for the United States et al., appellants in Nos. 119 and 334 and appellees in No. 118. With him on the brief were *Solicitor General Sobeloff, Ralph S. Spritzer, Samuel R. Howell, Robert L. Farrington* and *Neil Brooks.*

*Robert L. Simpson,* Assistant Attorney General, argued the causes for the Washington Public Service Commission

et al., and *Bert L. Overcash* argued the causes for the State of Nebraska et al., appellants in Nos. 118 and 332 and appellees in Nos. 117 and 119. On the brief were *Don Eastvold,* Attorney General, and *Mr. Simpson* for the Washington Public Service Commission, *Clarence S. Beck,* Attorney General, and *Mr. Overcash* for the State of Nebraska et al., *George F. Guy,* Attorney General, for the State Board of Equalization and Public Service Commission of Wyoming, and *C. W. Ferguson* for the Public Utilities Commissioner of Oregon.

The causes were submitted on briefs by *John R. Barry* for the Public Service Commission of Utah et al., *William J. Hickey* for the American Short Line Railroad Association, and *Lee J. Quasey* for the National Live Stock Producers Association et al., appellees in Nos. 332, 333 and 334.

MR. JUSTICE BLACK delivered the opinion of the Court.

These cases all involve the validity of a single order of the Interstate Commerce Commission establishing through railroad routes and prescribing joint through rates for carriage of certain goods over the routes. The Commission's order was made after lengthy hearings upon complaint of the Denver & Rio Grande Western Railroad Company. The Rio Grande's main line runs from Ogden, Salt Lake City, and Provo, Utah, across much of Colorado to Denver, Pueblo, and Trinidad. The chief controversy involved in this case is between the Rio Grande and the Union Pacific Railroad Company. The Union Pacific lines which are relevant here run from points in Washington and Oregon through Idaho, Utah, Wyoming, Colorado, Kansas, and Nebraska, going as far east as Omaha and Kansas City. The Union Pacific and Rio Grande connect at Ogden, Salt Lake City, and Provo, Utah, and at Denver, Colorado. The connection at Ogden is known

as the Ogden Gateway, meaning the gateway between the northwestern states served by the Union Pacific and states to the south and east served by the Rio Grande. The Union Pacific has used its strategic position in the northwest territory in such a way that practically all traffic between the Northwest, Denver and points east and south of Denver goes over its lines. For this reason the Northwest is often referred to as "closed door" territory. This situation caused the Rio Grande to file its complaint with the Commission. It charged that the Union Pacific had agreements with other connecting railroads named defendants under which goods could be carried to and from the Northwest at joint through rates, but that the only way the Rio Grande could carry goods to and from this area was by exacting higher "combination rates," which are the sum of local rates. These high rates practically bar the Rio Grande as a connecting carrier for through shipments to and from the Northwest. The Rio Grande asked the Commission to order the Union Pacific to establish and maintain for the future "just, reasonable and non-discriminatory competitive joint through rates" with the Rio Grande. It charged that the Union Pacific's failure to establish and maintain such rates violated §§ 1 (4), 3, 15 (1), and 15 (3) of the Interstate Commerce Act.[1] Section 15 (1) authorizes the Commission to proscribe individual or joint rates or practices that are "unjust or unreasonable or unjustly discriminatory or unduly preferential or prejudicial" and to prescribe rates and practices that are "just, fair, and reasonable." Section 15 (3) empowers the Commission to establish

[1] 24 Stat. 379, 380, 384, as amended, 49 U. S. C. §§ 1 (4), 3, 15 (1), 15 (3). Section 1 (4) makes it the duty of common carriers "to establish reasonable through routes with other such carriers, and just and reasonable rates . . . ." And § 3 (4) enjoins carriers to "afford all reasonable, proper, and equal facilities for the interchange of traffic" without discrimination or undue prejudice.

through routes and joint rates whenever deemed by the Commission "to be necessary or desirable in the public interest." Section 15 (4), which is very important in this controversy, places restrictive conditions upon the Commission's power to establish through routes under § 15 (3) when the establishment of a through route would require a railroad "without its consent, to embrace in such route substantially less than the entire length of its railroad and of any intermediate railroad operated in conjunction and under a common management or control therewith, which lies between the termini of such proposed through route . . . ." [2] This provision is generally referred to as a prohibition against making a railroad "short-haul" itself. Among other findings the Commission must make under § 15 (4) before establishing a through route which requires a railroad to short-haul itself is that the new route "is needed in order to provide adequate, and more efficient or more economic, transportation . . . ."

The Rio Grande's petition before the Commission alleged that through routes with the Union Pacific already existed through the Ogden Gateway. It contended that they had been created and used by the Union Pacific. On this basis Rio Grande claimed that the restrictive conditions of § 15 (4) did not apply and that the Commission need not concern itself with those conditions but should proceed to establish reasonable joint rates under § 15 (3). After hearing much evidence the Commission rejected this contention and found that the through routes claimed by Rio Grande did not exist.[3] The Commission went on to find, however, that through routes should be established with reference to certain commodities such as fruits,

---

[2] 24 Stat. 384, as amended, 49 U. S. C. § 15 (4).

[3] Five Commissioners thought that through routes were in existence; five were of the opinion that they were not. Under ICC practice this meant that the Rio Grande had failed to prove its allegation that through routes existed.

perishable foods, and livestock in a limited geographical area. The Commission found in accordance with § 15 (4) that these new routes were needed "to provide adequate and more economic transportation . . . ." It also found as required by § 15 (3) that through routes and joint rates for the specified commodities were "necessary and desirable in the public interest." 287 I. C. C. 611, 659.

On the basis of its findings the Commission ordered the Union Pacific to establish through routes for the specified commodities and to establish joint rates the same as applied on its own and other connecting lines. The Union Pacific considered itself aggrieved because the order required establishment of some through routes and joint rates. The Rio Grande considered itself aggrieved both because of the geographical limitations of the Commission's order and because joint rates were not established for all commodities. The Union Pacific challenged the ICC order in a three-judge United States District Court in Nebraska and the Rio Grande challenged it in a three-judge United States District Court in Colorado. See 28 U. S. C. §§ 1336, 2284, 2321–2325. The Colorado court upset the order on a single ground. It held that there was no substantial evidence to support the finding that through routes were not in existence. Had the Commission found there were established through routes, the Colorado court reasoned, much broader relief for the Rio Grande might have been ordered, since the restrictions of § 15 (4) would not have been applicable. Consequently the Colorado court remanded the case to the Commission for further consideration. 131 F. Supp. 372. The Nebraska court accepted the Commission's finding that no through routes were in existence. It then held that there was evidence before the Commission sufficient to support the finding under § 15 (4) that through routes were needed "in order to provide adequate and more economic transportation" for specified commodities shipped from

the Northwest to initial destination points on the Rio Grande for "in-transit privileges incident to reshipment to points east of Denver . . . ." 132 F. Supp. 72, 82. The Nebraska court declined, however, to sustain the Commission's action with reference to shipments not requiring such transit services. Both District Court decrees are now before us on direct appeal under 28 U. S. C. §§ 1253 and 2101 (b). They were consolidated for oral argument and we treat them together here. It is convenient to take up first the Colorado court's holding.

In considering the question of through routes under § 15 (4) we begin with our recent holdings and opinions in *Thompson* v. *United States*, 343 U. S. 549; *United States* v. *Great Northern R. Co.*, 343 U. S. 562. We there emphasized the purpose of § 15 (4) to bar the Commission from compelling railroads to establish through routes resulting in trunkline "short-hauls" without faithful observance of restrictive conditions imposed by that section. At the same time we recognized that Commission action is not necessary to the creation of through routes. We pointed out that a through route is ordinarily a voluntary arrangement, express or implied, between connecting carriers, and that the existence of such an arrangement depends on the circumstances of particular cases. We said in *Thompson* v. *United States, supra,* at 557, that "In short, the test of the existence of a 'through route' is whether the participating carriers hold themselves out as offering through transportation service." Findings of through routes can therefore be made on the basis of express agreements between carriers or on the basis of inferences drawn from continuous practices sufficient to show that through routes exist even though not provided for in formal contracts or tariffs. The question in each case is one of fact. Cf. *Through Routes and Through Rates,* 12 I. C. C. 163, 166–167. The Colorado court viewed the evidence here as showing beyond dispute the

existence of through routes both by formal tariffs and by long railroad practices. Whether the evidence could have justified the Commission in finding the existence of through routes we need not determine. We are satisfied, however, that the evidence before the Commission did not compel it to make such a finding and that its conclusion that the through routes claimed were not in existence is supported by substantial evidence.

There was evidence that as early as 1897 the Union Pacific and lines it controlled did establish through routes to and from points in the "closed" northwest territory through the Ogden Gateway, and did establish joint through rates with the Rio Grande on the same basis as the joint through rates on Union Pacific's own lines. But these joint rates were canceled by Union Pacific in amended tariffs published between 1906 and 1912. Apparently there was no language in the published amended tariffs expressly and formally declaring that the through routes by way of the Ogden Gateway were also to be deemed closed. The amended tariffs, however, resulted in very high combination rates for northwest traffic transported by the Rio Grande. The effect of these high rates has been greatly to handicap if not actually to close the Rio Grande as an artery for through traffic between the Northwest, Denver and points south and east. Of course the effect of such rates might not be enough standing alone to show a voluntary abandonment of the through routes. See *Virginian R. Co.* v. *United States,* 272 U. S. 658, 666; *Thompson* v. *United States, supra,* at 556–558. At the same time it cannot be said that the Union Pacific's failure formally to declare the through routes abandoned in 1906 (when it canceled joint rates) automatically left the through routes in existence for § 15 (4) purposes in 1949 when this litigation started. Cancellation of the rates in 1906 without formal cancel-

lation of the routes is only a circumstance to be considered along with other circumstances in determining whether through routes now exist. The Colorado court relied on railroad practices as other circumstances which, considered with the failure expressly to abandon through routes, were sufficient to compel the Commission to hold that through routes did exist. We turn to that.

At best for the Rio Grande the evidence of railroad practices with reference to the continued existence of through routes showed the following. Despite the high combination rates a small number of shipments continue to trickle through the Ogden Gateway to and from the closed northwest territory. In 1948, which the Commission considered a representative year, a number of carload shipments moved on through bills of lading along the alleged through routes. But none of them coming from the Northwest went further than points on the Rio Grande in Colorado also served by the Union Pacific and connecting lines. There were a few shipments of various commodities from east and south of Denver which went by way of the Rio Grande through the Ogden Gateway. The total shipments over the alleged through routes, however, were no more than a fractional part of one percent of the traffic carried to and from the Northwest by way of the Union Pacific routes. It is also undisputed that through routes and joint rates exist for eastbound shipments of sheep and goats. During World War II some Army troop and supply trains moved over the Rio Grande on through bills of lading. In addition to the foregoing some traffic moved over the Rio Grande in 1949 when snow storms blocked the Union Pacific route through Wyoming. These movements were made under service orders of the Commission, which did not exercise its authority under § 15 (4) to establish emergency through routes.

The Union Pacific produced evidence tending to show that there were no through routes. It quite plainly appears from the record that there has been a long-standing struggle between the Union Pacific and the Rio Grande over the efforts of the Union Pacific to keep the Ogden Gateway closed. We think the record supports the finding of the Commission that:

"There is no indication that any of the defendants has ever solicited any traffic from and to the areas here concerned for routing over a Rio Grande route by which a higher combination rate applied, or has ever used such a Rio Grande route except where called upon to do so by routing specified by the shipper or by a prior connecting carrier. In other words, so far as this record shows, 'the carriers' course of business' has been and is to use the Union Pacific routes except where called upon to use the Rio Grande routes by force of shippers' or connecting carriers' routing. The whole course of conduct of the Union Pacific, so far as revealed, has been for many years and is now to guard jealously its long haul and not open commercially the Rio Grande routes on this traffic." 287 I. C. C., at 618.

We adhere to the "holding out" test of the *Thompson* case. The evidence before the Commission was not such as to compel it to find that the Union Pacific held itself out as offering through service over the Rio Grande lines. It was error for the Colorado District Court to set aside the Commission's finding and to remand the case to the Commission. This brings us to a consideration of the Nebraska District Court's action.

The Commission required the Union Pacific to establish through routes and joint rates with the Rio Grande for the carriage of certain commodities including livestock, fresh fruits and vegetables, frozen foods, butter, and

eggs.[4] The order rested on the Commission's conclusion that such through routes and joint rates were "necessary and desirable in the public interest, in order to provide adequate and more economic transportation . . . ." 287 I. C. C., at 659. This conclusion was based on findings from a vast amount of evidence both oral and written. The pertinent language of § 15 (4) allows the Commission to establish through routes where "needed in order to provide adequate, and more efficient or more economic, transportation." The dispute in the Nebraska court and here relates principally to the adequacy of the existing transportation services. The efficiency of Union Pacific services was established beyond dispute.

Section 15 (4) empowers the Commission to consider the interests of shippers and the kind of services they get and need as well as the interests of carriers in determining whether additional routes should be established to provide "adequate" and "more economic" transportation service.

---

[4] The Commission ordered the railroads:
"to maintain through routes, via Ogden or Salt Lake City, Utah, in connection with the line of the complainant, for the interstate transportation, in carloads, of granite and marble monuments from origins in Vermont and Georgia to destinations in the excluded territory in the northwest area, as described in the report, and of ordinary livestock, fresh fruits and vegetables, dried beans, frozen poultry, frozen foods, butter, and eggs, in carloads, from origins in the described excluded territory to destinations in the United States south and east of a line drawn along the southern boundary of Kansas, thence the eastern boundary of Kansas to but not including Kansas City, thence immediately west of points on the Missouri River from Kansas City, Kans., to Omaha, Nebr., thence immediately north of points on the lines of the Union Pacific Railroad Company and the Chicago and North Western Railway Company from Omaha to Chicago, Ill., including destinations in the lower peninsula of Michigan and in Oklahoma and Texas; and to apply on such traffic, over such through routes, joint rates the same as those maintained and applied on like traffic from and to the same points over routes embracing the lines of the Union Pacific Railroad Company through Wyoming."

332

We have held that in determining this question the Commission should look beyond the mere adequacy of the carrier's physical operations "to the broader public interest which embraces service to shippers and the rates they pay." *Pennsylvania R. Co.* v. *United States,* 323 U. S. 588, 591–593. The duty of the Commission, as we there stated, is to try to strike a fair balance in satisfying the needs of shippers, railroads, and the public. This of course calls for the Commission to exercise its informed judgment, having in mind its statutory obligation to develop, coordinate and preserve an adequate national transportation system.[5] This it did. Relying on our interpretation of § 15 (4) in the *Pennsylvania Railroad* case, the Commission considered the various interests here. It found that: "Because of their generally perishable nature, food articles . . . must be moved to market with expedition and care, and over as many routes as possible. This requires that many routes be open in order that unnecessary interruptions of the free flow of such commodities may be avoided and that as much flexibility as possible in the distribution process be permitted. A number of services, not only at origin and destination, but en route, which are not usually required in the movement of ordinary traffic, must be provided for these perishable and semiperishable commodities." 287 I. C. C., at 656. There are facilities along the Rio Grande route for feeding and grazing livestock in transit, and for partial unloading, storing or processing other shipments in transit. As a result shippers in the northwest territory were found to be "debarred from effective participation in the widespread system developed for the marketing of such commodities" and processors, shippers and dealers along the Rio Grande were found to be at a disadvantage in

---

[5] 54 Stat. 899. See also *New England Divisions Case,* 261 U. S. 184; *United States* v. *Great Northern R. Co.,* 343 U. S. 562, 575–576.

competing with those on the Union Pacific. For the specified commodities the Commission found the Union Pacific routes to be "inadequate and less economical than are the Rio Grande routes." [6] The Nebraska District Court sustained the Commission's order with reference to shipments which required transit services on the Rio Grande. We agree with this portion of the holding. We cannot say that the Commission acted in excess of its authority in concluding, on the mass of evidence before it, that through routes and joint rates on the specified commodities were needed to provide adequate and more economic transportation and were necessary in the public interest.

But the scope of the Commission's order was cut down by the Nebraska court insofar as it established through routes and joint rates on shipments that did not require transit services such as we have mentioned. We disagree with the Nebraska District Court in this respect. The evidence showed and the Commission found that in marketing food and other perishable products it is a general practice among railroads to allow diversion of carloads in transit as markets are found and sales are made. The successful operation of this practice requires the existence of joint through rates to the final market, since diversion or reconsignment would often, as a practical matter, be unavailable to a shipper who is compelled to reconsign his goods at high combination rates. The Commission found that "If a shipment reaches a point through which a combination of rates applies and the sale is lost, it is frequently necessary to dispose of the shipment at that point at a forced or distress price. Such points are called

---

[6] Because of the inability of most granite and marble monument retailers to purchase entire carload lots the Commission found "an urgent need for the establishment of joint through rates on this traffic to destinations in the excluded territory with stop-off privileges at intermediate points on the Rio Grande." 287 I. C. C., at 638.

closed or pocket markets." 287 I. C. C., at 642. To illustrate its conclusion that combination rates result in inadequate transportation service in situations where shippers are compelled to reconsign, the Commission noted that: "Idaho producers are in competition with shippers in other producing areas and find it difficult to compete on shipments routed over the Rio Grande via Ogden or Salt Lake City. One Idaho shipper has made few sales of potatoes in the Southwest in the last several years because of pocket markets there." 287 I. C. C., at 643. Pocket markets, of course, exist because reconsignment is possible only at high combination rates. We see no reason why a shipper's privilege to have his goods reconsigned at joint rates should not be considered on the same basis as transit services in determining the adequacy and economy of existing transportation. We think it was error for the Nebraska court to narrow the scope of the Commission's order by excluding shipments of commodities which so urgently need the advantage of reconsignment privileges at joint rates.

Many other arguments are made against the Commission's order. It is pointed out, for example, that the Rio Grande road has more curves than the Union Pacific. Its grades are steeper. Consequently its traffic is sometimes slower. It is contended that the evidence as a whole is insufficient to justify the holding that the establishment of through routes will be of such great advantage to shippers and the public that the Union Pacific should be compelled to short-haul itself. We are not unmindful of the force of the arguments made by the Union Pacific and by those who have intervened on its side. It is entirely possible that the Commission could have made findings contrary to those it did make. But on the whole we are unable to say that the Commission did not strike a fair balance in finding that the evidence required the establishment of these through routes and joint rates.

After consideration of all the contentions made, we hold that the Nebraska court should have sustained the Commission's order in full.[7] Since the Commission's order is justified under §§ 15 (1), 15 (3) and 15 (4) we have no occasion to consider contentions raised under §§ 3 (1) and 3 (4).

The judgment of the District Court of Colorado is reversed with directions to dismiss the bill. The judgment of the Nebraska District Court is affirmed insofar as it affirmed the order of the Commission, and is reversed insofar as the court refused to enforce the Commission's order.

*It is so ordered.*

MR. JUSTICE FRANKFURTER, dissenting.

I agree with the Court that through routes were not in existence and that joint rates are therefore not empowered under § 15 (3) of the Interstate Commerce Act, unqualified by § 15 (4). 54 Stat. 898, 911–912, 49 U. S. C. § 15 (3), (4). The controversy thus turns on the enforcement of congressional policy expressed as follows in § 15 (4):

> "In establishing any such through route the Commission shall not (except as provided in section 3, and except where one of the carriers is a water line) require any carrier by railroad, without its consent, to embrace in such route substantially less than the entire length of its railroad and of any intermediate railroad operated in conjunction and under a common management or control therewith, which lies between the termini of such proposed through route, (a) unless

---

[7] In reaching our conclusion we have not overlooked attacks on the breadth of the order with respect to marble, granite, and livestock shipments, nor challenges to that part of the order correcting discrimination in favor of the Bamberger Railroad.

such inclusion of lines would make the through route unreasonably long as compared with another practicable through route which could otherwise be established, or (b) unless the Commission finds that the through route proposed to be established is needed in order to provide adequate, and more efficient or more economic, transportation: *Provided, however, That* in prescribing through routes the Commission shall, so far as is consistent with the public interest, and subject to the foregoing limitations in clauses (a) and (b), give reasonable preference to the carrier by railroad which originates the traffic. . . ."

As is true so often in applying regulatory legislation, the general approach—that is, the starting point—may be determinative of the result. It makes a vital difference whether § 15 (4) is deemed a restriction on the power of the Interstate Commerce Commission which is to be closely confined and sharply construed or whether it is deemed to express a legislative command which ought to be heeded and not slightingly enforced. The fact of the matter is that we are dealing with a provision of the law which the Commission has long considered undesirable from the point of view of a national railroad policy and whose repeal it has consistently urged upon Congress. (See the history set forth in *Thompson* v. *United States,* 343 U. S. 549, 554–556.) Although Congress has, from the time of the Commission's creation and especially in recent years, relied on the Commission as its expert adviser on policy, and legislation has largely reflected the Commission's recommendations, the latter's persistence in recommending repeal of § 15 (4) has been matched and overborne by the persistence of Congress in retaining it. Congress has emphatically made clear that in its view the national interest requires the protection of railroads against being short-hauled. Encouragement should not

be given to disregard of that policy, even if such disregard occurs through inadequate observance attributable to an unconscious desire to restrict the scope of the statute. In short, when an order of the Commission is brought under judicial scrutiny, and challenge is made that the safeguards of § 15 (4) have not been observed, it is the duty of this Court to apply the policy expressed by that section. If the requisite findings or conclusions are ambiguous or unclear, or the policy of the section is slighted, our duty demands remand to the Commission to dispel ambiguity or to secure clarity and obedience to the policy.

It is my view that, even though evidence may be found in the record to support a portion of the order, the Commission did not support the portion on that basis but, on the contrary, appears to have justified the whole order on considerations that collide with congressional policy. The proceedings should therefore be returned to the Commission and the order ought not to be sustained in whole or in part. I will summarize the reasons for this conclusion.

The Commission ordered the establishment of through routes and joint rates by the Union Pacific with the Rio Grande for shipments of livestock and certain perishable agricultural products originating in the northwest (excluded) territory and destined for that part of the United States which the Nebraska District Court roughly described as "east of Denver." * 132 F. Supp. 72, 75, n. 1.

---

*It used the phrase to designate the points included in the order with respect to which through routes and joint rates were ordered established for livestock and certain agricultural commodities by the Union Pacific with the Rio Grande. The Commission in its order defined these points as:

"destinations in the United States south and east of a line drawn along the southern boundary of Kansas, thence the eastern boundary of Kansas to but not including Kansas City, thence immediately west of points on the Missouri River from Kansas City, Kans., to Omaha,

Apparently, through routes and joint rates were already in existence for shipments via the Ogden Gateway between the northwest territory and intermediate points on the Rio Grande, originating or terminating at those intermediate points. Joint through rates, however, were not generally in effect over the Rio Grande to or from the Colorado or Utah common point territory (*e. g.,* Denver, Colorado Springs, and Pueblo; Ogden, Salt Lake City, and Provo) of the Rio Grande and the Union Pacific and other defendants, or for transcontinental traffic between the northwest territory and points east of the Colorado common points. The Commission did not order through routes and joint rates to the Utah or Colorado common points or to a large area which is in fact east of Denver. (See description in footnote *.) Through routes and joint rates over the Rio Grande also were not ordered for westbound traffic to the northwest territory originating east of the Colorado common points, except for granite and marble monuments from origins in Vermont and Georgia. The Commission found that it was "necessary and desirable in the public interest, in order to provide adequate and more economic transportation," 287 I. C. C. 611, 659, to establish the specified through routes and joint rates. The Commission gave this justification for its finding:

"... The growth of our population and the development of the country have required a constantly expanding flow of diverse commodities. ... Movements of transcontinental proportions are involved in important instances. ... A complex but efficient marketing system has been evolved to provide as

---

Nebr., thence immediately north of points on the lines of the Union Pacific Railroad Company and the Chicago and North Western Railway Company from Omaha to Chicago, Ill., including destinations in the lower peninsula of Michigan and in Oklahoma and Texas . . . ."

orderly a distribution of food commodities as possible. Adequate transportation facilities and services are required for the proper functioning of the system. Because of their generally perishable nature, [the enumerated] food articles . . . must be moved to market with expedition and care, and over as many routes as possible. This requires that many routes be open in order that unnecessary interruptions of the free flow of such commodities may be avoided and that as much flexibility as possible in the distribution process be permitted. A number of services, not only at origin and destination, but en route, which are not usually required in the movement of ordinary traffic, must be provided for these perishable and semiperishable commodities." 287 I. C. C., at 655–656.

The Commission also found support for its conclusion that shippers of these products are debarred from participation in the widespread marketing system in the fact that "in-transit" privileges on the Rio Grande, such as stop-off for partial unloading or processing, or for grazing of cattle, are not available to shippers of these commodities from the northwest territory, except at the higher combination rates.

The Commission considered through routes and joint rates to points "east of Denver" as a unitary problem and saw no difference between shipments destined initially to intermediate points on the Rio Grande and shipments destined initially to points "east of Denver." The Nebraska District Court, however, found nothing in the evidence to support a finding that the transportation service furnished by Union Pacific on through service between the northwest territory and points "east of Denver" was inadequate, and as to livestock this restriction was not contested by the Commission on this appeal. The Nebraska District Court, therefore, narrowed the order to

require through routes and joint rates only for those car-
loads originating in the northwest territory and consigned
to initial destination points on the Rio Grande west of
Denver, Pueblo, and Trinidad, Colorado, which require
"in-transit" privileges incident to reshipment to points
east of those places.

The Court, rejecting the narrowed construction by the
Nebraska District Court, affirms the Commission's order
as written. In doing so, however, it does not rely on the
reasons given by the Commission in support of its conclu-
sion, but rather it affirms on a different basis. How can
we know whether, and to what extent, the Court's reasons
influenced the Commission, or would influence it, in mak-
ing its decision? The report certainly indicates that the
Commission thought its own reasoning sufficient to sup-
port the whole order. Once the Commission's reasoning
for a conclusion is found wanting, the conclusion is neces-
sarily impaired. While the judgment of a lower court
may be sustained by this Court on a ground other than
that on which it was rested below, see *Langnes* v. *Green,*
282 U. S. 531, 534–539; *Helvering* v. *Gowran,* 302 U. S.
238, 245–247, the legal relation between the Commission
and the courts is of a very different order from that of a
lower court and a reviewing court. A Commission having
defined and limited delegated power must justify the
exercise of that power by findings that support it and by
evidence that supports the findings. When regard is had
for the complicated technical nature of the problems and
the voluminousness of the records in the important cases
that come before the Commission, a fair discharge of its
functions precludes casting upon a reviewing court the
task of quarrying though a record to find for itself
adequate evidence to permit the effectuation of orders of
the Commission.

The precise function of findings is to make practicable
scrutiny by the courts in order to determine whether the

Commission has kept within the bounds legislatively defined. To be sure, the Commission's findings are not binding in the sense that attack cannot be made on them for lack of evidence. *ICC* v. *Louisville & Nashville R. Co.*, 227 U. S. 88, 91–94. The Commission cannot—it has not purported to do so here—pass on to the Court an unanalyzed summary of a long proceeding and call it findings. While findings need not be formulated in an enumerated sequence, helpful as that would be, they must at least appear in a Commission's decision with unambiguous clarity, and they must be logically related to its conclusion. The justification the Commission has given cannot be rejected and a new justification found by the Court to satisfy the requirement of a foundation for judicial review. *SEC* v. *Chenery Corp.*, 318 U. S. 80, 92–95. After all, it is the Commission which Congress has established as the expert in this field.

The Commission treated the whole problem of joint rates alike, whether the shipment was initially destined for intermediate points on the Rio Grande or whether it was a through shipment. The Court now finds one justification, the inability to use available "in-transit" privileges of the Rio Grande, to support the order in the former situation, and another justification, elimination of "pocket markets," to support the order in the latter situation. It does not rely on what appears to have been the principal, if not the only, reason which the Commission thought justified its whole order, the necessity for the specified products to be able to move to market "over as many routes as possible." Indeed, that viewpoint of the Commission is directly contrary to the congressional policy expressed in § 15 (4). The theory of that section is that products are not to be able to move to markets "over as many routes as possible" when that would involve short-hauling a carrier without its consent on the proposed through route, unless, among other things, the

transportation already in existence is inadequate. To make available to shippers as many routes to market as possible is a policy which the Commission has long urged but which the Congress has resolutely rejected. To find inadequacy of service on a short-hauled carrier in that other routes are not made available would virtually nullify § 15 (4).

It may well be that what are somewhat misleadingly called "in-transit" privileges justify joint through rates to shipments stopped at intermediate points on the Rio Grande for those privileges, and on similar reasoning joint through rates might be justified for shipments initially consigned to intermediate points on the Rio Grande and thereafter reconsigned to points "east of Denver" if the sale is lost, subject to findings being made concerning reconsignment privileges on the Rio Grande. In both situations it is a fiction to speak of a single shipment on which the Union Pacific would be short-hauled should the proposed through route go into effect. The situation involves two separate shipments for which, under normal railroad practice, only the rate of a single continuous shipment over the whole route is charged. On neither of these shipments is Union Pacific being short-hauled because it is capable of performing neither. In this sense, Union Pacific service is of course not "adequate"; it is non-existent. But the Commission did not found its order on such an analysis, and I cannot confidently surmise that it would have ordered the establishment of through routes and joint rates on this basis. Such a determination should be left for the Commission.

The Court also affirms that part of the Commission's order establishing through routes and joint rates for shipments destined initially to points "east of Denver." It does so both with respect to the specified agricultural products and with respect to livestock, even though the Commission did not before us contest the Nebraska Dis-

trict Court's elimination of through routes and joint rates for livestock to points "east of Denver" for want of evidence to support a finding of inadequacy of service. This Court relies for support of this very important portion of the Commission's order on a few paragraphs of the Commission's report under the heading "Proponents' Testimony" where some testimony concerning "pocket markets" is set forth. The Commission in its "General Discussion and Ultimate Fact Findings" makes no reference to the "pocket market" problem as supporting its order. Indeed, the discussion of "pocket markets" seems related only to the refusal of the Union Pacific to establish joint through rates on shipments going through certain points even over its own lines (because the points involved are off the main line and substantial back hauls or out-of-line hauls are required), and has nothing at all to do with the Rio Grande. Moreover, the order requiring the Union Pacific to establish through routes with the Rio Grande prescribes that there be maintained over such routes only joint rates "the same as those maintained and applied on like traffic from and to the same points over routes embracing the lines of the Union Pacific Railroad Company through Wyoming." From all that appears on the record before us, this could not affect the "pocket markets" complained of because at those points there are no joint through rates over the Union Pacific. Since the establishment of through routes and joint rates for shipments destined initially to points "east of Denver" appears to have no effect on "pocket markets," it is difficult to understand how the "pocket market" situation can be used to justify the establishment of such routes and rates.

The upshot of all this is that after the Nebraska three-judge District Court disagreed about the justification for the order and the majority thought it could be saved by narrowing it, this Court reinstates the whole order, but on

a different basis from that of the Commission, and with respect to a major portion of the order, it does so on a ground which appears to have no support in the Commission's findings. I do not say that no through routes or joint rates can be established through the Ogden Gateway. But I do believe that it is neither for the District Court nor for this Court to speculate what the Commission would have done if it were required to disregard some of its important views on policy, as this Court has disregarded them. I also believe that it is not our duty to find reasons to support the Commission's order which the Commission on full consideration did not summon to its support. This is a striking instance of a case requiring remand to the Commission for clarification and reconsideration of the basis for decision. See *United States* v. *Chicago, M., St. P. & P. R. Co.*, 294 U. S. 499, 510–511.

MR. JUSTICE HARLAN, dissenting.

I agree with the opinion of MR. JUSTICE FRANKFURTER, except that I would consider an order of the Commission limited to establishing through routes and joint rates on shipments destined initially to intermediate points on the Rio Grande to be supported by the present findings. Accordingly, I would affirm the judgment of the Nebraska District Court, which remanded the case to the Commission to allow it to determine whether such a limited order would be in the public interest and for any further proceedings not inconsistent with its opinion.